F. #2016R00467

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | I N F O R M A T I O N |
| - against - | Cr. No. 18-439 (MKB) |
| | (T. 18, U.S.C., §§ 371, 981(a)(1)(C), |
| TIM LEISSNER, | 982(a)(1), 982(b), 1956(h) and 3551 et |
| | seq.; T. 21, U.S.C., § 853(p); T. 28, |
| Defendant. | U.S.C., § 2461(c)) |

- - - - - - - - - - - - - - - - - - - - - - - - - - X

THE UNITED STATES CHARGES:

At all times relevant to this Information, unless otherwise indicated:

I.    The Defendant

1.    Between in or around 1998 and in or around February 2016, the

defendant TIM LEISSNER was employed by various subsidiaries, and acted as an agent and

employee, of U.S. Financial Institution #1.[1]  Between at least in or around November 2011

and in or around December 2015, LEISSNER was employed by, and acted as an agent of,

Subsidiary A of U.S. Financial Institution #1, an entity described below.   Prior to his

separation from U.S. Financial Institution #1 in or around February 2016, LEISSNER was

the Southeast Asia Chairman and a Participating Managing Director of U.S. Financial

Institution #1, and he was responsible for U.S. Financial Institution #1's relationship with

1Malaysia Development Berhad ("1MDB"), Malaysia's state-owned and state-controlled

investment development company.   LEISSNER was an "employee" and "agent" of an

---

[1]    The identity of U.S. Financial Institution #1 and all other anonymized entities and
individuals discussed herein are known to the defendant and the United States.

"issuer" within the meaning of the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-1(a), and an "employee" and "agent" of a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(a).

II.    Relevant Entities and Individuals

      A.    U.S. Financial Institution #1 and Subsidiary A

          2.    U.S. Financial Institution #1 was a global investment banking, securities and investment management firm incorporated in Delaware and headquartered in New York, New York.   It conducted its activities primarily through various subsidiaries and affiliates (collectively hereinafter, "U.S. Financial Institution #1"), including those that employed the defendant TIM LEISSNER and some of his co-conspirators, including Co-Conspirator #2 and Co-Conspirator #4.   U.S. Financial Institution #1 had a class of securities registered pursuant to Section 12 of the Securities and Exchange Act of 1934 (Title 15, United States Code, Section 78) (the "Exchange Act") and was required to file reports with the U.S. Securities and Exchange Commission under Section 15(d) of the Exchange Act (Title 15, United States Code, Section 78o(d)).   As such, U.S. Financial Institution #1 was an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

          3.    Subsidiary A, a subsidiary of U.S. Financial Institution #1, was incorporated in Delaware.   As such, Subsidiary A of U.S. Financial Institution #1 was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1)(B).

B.  1MDB and Other Relevant Entities

4.  1MDB was a strategic investment and development company wholly-owned and controlled by the Government of Malaysia through its Ministry of Finance ("MOF").  It was formed in or around 2009, when the Malaysian government took federal control of Terengganu Investment Authority ("TIA"), which had previously been the sovereign wealth fund of the state of Terengganu in Malaysia.  1MDB was created to pursue investment and development projects for the economic benefit of Malaysia and its people, primarily relying on debt to fund these investments.  1MDB's development projects were focused in the areas of energy, real estate, tourism and agribusiness.  1MDB was overseen by senior Malaysian government officials, was controlled by the Malaysian government and performed a government function on behalf of Malaysia.  1MDB was thus an "instrumentality" of a foreign government within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

5.  Foreign Agency A was an investment fund wholly-owned by the Government of Abu Dhabi.  It was established by the Government of Abu Dhabi pursuant to an Emiri Decree in or around 1984 with a mandate to advance Abu Dhabi's natural petroleum wealth for the development of the emirate.  Foreign Agency A was overseen by senior Abu Dhabi government officials, was controlled by the Abu Dhabi government, which appointed all the members of Foreign Agency A's board of directors, and performed a government function on behalf of Abu Dhabi.  Foreign Agency A was thus an "instrumentality" of a foreign government within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

6.      Foreign Investment Firm A, a subsidiary of Foreign Agency A, was a private joint stock company incorporated under the laws of Abu Dhabi.

C.      <u>Other Relevant Individuals</u>

7.      Co-Conspirator #1 was a Malaysian national who advised on the creation of TIA, 1MDB's predecessor entity.   Co-Conspirator #1 did not hold a formal position at 1MDB or with the Governments of Malaysia or Abu Dhabi, but the defendant TIM LEISSNER and his co-conspirators knew that Co-Conspirator #1 worked as a finder and intermediary in relation to 1MDB and other government officials on numerous financial transactions and projects involving U.S. Financial Institution #1.

8.      Co-Conspirator #2 was a Malaysian national who was employed as a Managing Director and acted as an agent of U.S. Financial Institution #1.   Co-Conspirator #2 worked with the defendant TIM LEISSNER at U.S. Financial Institution #1 from approximately 2009 to May 2014.   Co-Conspirator #2 was thus an "employee" and "agent" of an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

9.      Co-Conspirator #3 was a U.S. citizen who was a high-ranking official of Foreign Investment Firm A from at least in or around 2012 until in or around 2014.

10.     Co-Conspirator #4 was an Italian national who was employed as a Participating Managing Director and acted as an agent of U.S. Financial Institution #1 from approximately 2007 to present.   Co-Conspirator #4 was thus an "employee" and "agent" of an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

11.     Co-Conspirator #5 was a Chinese national, resident of Hong Kong and close relative of the defendant TIM LEISSNER.

D.     Government Officials

12.     1MDB Official #1 was a high-ranking official at 1MDB from at least in or around 2012 until in or around 2014.   1MDB Official #1 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).   1MDB Official #1 served as one of the principal points of contact between 1MDB and U.S. Financial Institution #1 in connection with 1MDB business.

13.     1MDB Official #2 was a high-ranking official of 1MDB from at least in or around 2012 until in or around 2014.   1MDB Official #2 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

14.     1MDB Official #3 was a high-ranking official at 1MDB from at least in or around 2012 until in or around 2014.   1MDB Official #3 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).   1MDB Official #3 was a principal point of contact between 1MDB and U.S. Financial Institution #1 in connection with three bond offerings by 1MDB in 2012 and 2013.

15.     Malaysian Official #1 was a Malaysian national and high-ranking official in the Malaysian government and the MOF from in or around at least 2009 until in or around 2018 with high-level authority to approve 1MDB business decisions.   Malaysian

Official #1 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

16.    Abu Dhabi Official #1 was a high-ranking official of Foreign Agency A between at least in or around 2012 until in or around 2014, and a high-ranking official of Foreign Investment Firm A.   Abu Dhabi Official #1 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

III.    The Criminal Scheme

    A.    Overview

17.    The defendant TIM LEISSNER, while acting within the scope of his employment as an agent of U.S. Financial Institution #1, with the intent, at least in part, to benefit U.S. Financial Institution #1, conspired with others, including certain individuals and entities referenced above, to obtain and retain business from 1MDB for U.S. Financial Institution #1 through the promise and payment of bribes and kickbacks to government officials in Malaysia and Abu Dhabi, and by embezzling funds from 1MDB for himself and others.   LEISSNER, together with others, also conspired to launder those bribes, kickbacks and other embezzled funds from 1MDB through financial systems in the U.S. and elsewhere. As part of the scheme, LEISSNER—the lead coverage banker handling the 1MDB business for U.S. Financial Institution #1—together with others, including Co-Conspirator #2, used Co-Conspirator #1's close personal relationships with Malaysian Official #1 and other government officials in Abu Dhabi and Malaysia to obtain and retain 1MDB business for U.S. Financial Institution #1 through the promise and payment of bribes and kickbacks to these government officials.

18.     In the course of the scheme, the defendant TIM LEISSNER, together with Co-Conspirator #1, Co-Conspirator #2 and others, did obtain and retain 1MDB business for U.S. Financial Institution #1, including three bond offering transactions for 1MDB in 2012 and 2013.   These three bond offerings and related transactions ultimately earned U.S. Financial Institution #1 approximately $600 million in fees and revenue and resulted in LEISSNER, Co-Conspirator #2 and others obtaining large bonuses from U.S. Financial Institution #1 and enhanced their professional reputations at U.S. Financial Institution #1.

19.     Although the stated purpose of the approximately $6.5 billion raised by the three bond transactions was to support 1MDB projects for the benefit of the Malaysian people, more than $2.7 billion was instead misappropriated by the defendant TIM LEISSNER and his co-conspirators and distributed as bribes and kickbacks to government officials in Malaysia and Abu Dhabi, including 1MDB Official #1, 1MDB Official #2, 1MDB Official #3, Malaysian Official #1 and Abu Dhabi Official #1, as well as to other co-conspirators and their families, including LEISSNER, Co-Conspirator #1 and Co-Conspirator #2.

20.     In the course of the scheme, the defendant TIM LEISSNER also conspired with other employees and agents of U.S. Financial Institution #1, including Co-Conspirator #2 and Co-Conspirator #4, to knowingly and willfully circumvent the internal FCPA and accounting controls of U.S. Financial Institution #1 in connection with the three 1MDB bond transactions and other 1MDB business.   U.S. Financial Institution #1's various internal FCPA and accounting controls were overseen and enforced by its compliance function (the "Compliance Group") and its legal department (the "Intelligence Group").   These groups worked in conjunction with, and as part of, various committees in

reviewing transactions, including the three 1MDB bond deals, for approval. LEISSNER, Co-Conspirator #2, Co-Conspirator #4 and other employees and agents of U.S. Financial Institution #1 knew that Co-Conspirator #1 played a central role in the bond transactions, including by acting as an intermediary between U.S. Financial Institution #1, 1MDB and other Malaysian and Abu Dhabi government officials. LEISSNER, Co-Conspirator #2 and other employees and agents of U.S. Financial Institution #1 also knew that Co-Conspirator #1 promised to pay bribes and kickbacks to these officials to secure 1MDB business for U.S. Financial Institution #1. Despite this knowledge, LEISSNER, Co-Conspirator #2 and other employees and agents of U.S. Financial Institution #1 conspired to conceal that and other information from U.S. Financial Institution #1's Compliance Group and Intelligence Group in order to prevent them from attempting to stop U.S. Financial Institution #1 from participating in the lucrative transactions.

B.  The Defendant TIM LEISSNER Began Conspiring with Co-Conspirator #1 and Co-Conspirator #2 to Circumvent U.S. Financial Institution #1's Internal Controls and Win Business for U.S. Financial Institution #1

21.  Beginning in or around 2009, the defendant TIM LEISSNER began to conspire with Co-Conspirator #1 and Co-Conspirator #2 to circumvent U.S. Financial Institution #1's internal controls and win business for U.S. Financial Institution #1. At the time, LEISSNER and Co-Conspirator #2 were both agents acting within the scope of their employment on behalf of U.S. Financial Institution #1, with the intent, at least in part, to benefit U.S. Financial Institutions #1, and they collaborated on the creation of, and potential fundraising for, TIA, while knowing that Co-Conspirator #1 was an adviser for TIA. While working on this deal, LEISSNER and Co-Conspirator #2 selectively disclosed to other employees of U.S. Financial Institution #1 that they were working with Co-Conspirator #1 as

an intermediary to secure the deal, because they knew that such disclosure could have triggered steps to be taken by certain personnel within the Compliance Group and Intelligence Group to investigate the business relationship with Co-Conspirator #1 and possibly jeopardize the deal.

22.     During the course of the TIA transaction and in the two years following it, the defendant TIM LEISSNER continued to conspire with others, including Co-Conspirator #1 and Co-Conspirator #2, to develop business for U.S. Financial Institution #1, including with 1MDB. Notwithstanding Co-Conspirator #1's public denials about any involvement with 1MDB during this time, LEISSNER and others, including Co-Conspirator #2, knew that Co-Conspirator #1 remained close to 1MDB officials and government officials in Malaysia and Abu Dhabi. During this time, Co-Conspirator #1 also specifically requested that LEISSNER, Co-Conspirator #2 and others conceal his involvement in U.S. Financial Institution #1's business.

23.     Between in or around September 2009 and in or around March 2011, the defendant TIM LEISSNER and others, including Co-Conspirator #2, supported at least three attempts to make Co-Conspirator #1 a formal client of U.S. Financial Institution #1. LEISSNER and Co-Conspirator #2 supported these efforts because, in part, they believed that Co-Conspirator #1 would work to deliver lucrative business deals, including from 1MDB, for the ultimate benefit of U.S. Financial Institution #1, LEISSNER, Co-Conspirator #2 and others. These attempts were unsuccessful because certain personnel within U.S. Financial Institution #1's Compliance Group and Intelligence Group refused to approve the business relationship with Co-Conspirator #1 based, in part, on concerns that they had about the source of Co-Conspirator #1's wealth. Personnel within the Compliance Group and the

Intelligence Group communicated the rejection of Co-Conspirator #1's application to

LEISSNER, Co-Conspirator #2 and others. Notwithstanding their knowledge of the

concerns that had been raised about Co-Conspirator #1 not being a suitable client for U.S.

Financial Institution #1, LEISSNER and other employees and agents of U.S. Financial

Institution #1, including Co-Conspirator #2, continued to conspire with Co-Conspirator #1

based upon their belief that Co-Conspirator #1 would help ensure that government officials

within 1MDB, the Malaysian government and Abu Dhabi would deliver lucrative business

deals to U.S. Financial Institution #1.

      C.      The Defendant TIM LEISSNER Conspired with Others
to Win 1MDB Bond Deals for U.S. Financial Institution #1 Through the
Payment of Bribes and Kickbacks and to Conceal Co-Conspirator #1's
Involvement

      24.      Throughout 2012 and 2013, the defendant TIM LEISSNER conspired

with others, including Co-Conspirator #1 and Co-Conspirator #2, to obtain and retain

business from 1MDB for the benefit of U.S. Financial Institution #1 through the promise and

payment of bribes and kickbacks to government officials in Malaysia and Abu Dhabi using,

in part, misappropriated and embezzled proceeds from 1MDB bond transactions. During

this time, through the course of the scheme, LEISSNER, together with Co-Conspirator #1,

Co-Conspirator #2 and others, paid millions of dollars in bribes and kickbacks to government

officials, and obtained 1MDB business for U.S. Financial Institution #1, in particular, three

bond offering transactions underwritten by U.S. Financial Institution #1 for 1MDB referred

to as "Project Magnolia," "Project Maximus" and "Project Catalyze."

## PROJECT MAGNOLIA

25.     In or around early 2012, the defendant TIM LEISSNER met in Malaysia with others, including Co-Conspirator #1, Co-Conspirator #2, 1MDB Official #1, 1MDB Official #3 and Co-Conspirator #4.   The purpose of the meeting was to discuss 1MDB's proposed purchase of a Malaysian energy company ("Malaysian Energy Company A") and U.S. Financial Institution #1's ability to help obtain financing for the purchase, among other things.   During that meeting, LEISSNER, Co-Conspirator #2 and Co-Conspirator #4 discussed with Co-Conspirator #1, among other things, the type of guarantee that 1MDB needed to obtain in order to make the bond issuance acceptable to U.S. Financial Institution #1, and they ultimately agreed on the suitability of a guarantee from Foreign Agency A. LEISSNER, Co-Conspirator #2 and Co-Conspirator #4 understood that Co-Conspirator #1 was acting as an intermediary between 1MDB, Malaysian Official #1 and other government officials from Abu Dhabi.

26.     In late February 2012, the defendant TIM LEISSNER, Co-Conspirator #1, Co-Conspirator #2, 1MDB Official #3 and others met in London to discuss the proposed financing.   During this meeting, Co-Conspirator #1 explained that to obtain the guarantee from Foreign Agency A discussed at the prior meeting with LEISSNER and others, they would have to pay bribes and kickbacks to government officials, including to certain officials in Malaysia and Abu Dhabi.

27.     After the February 2012 meeting, Co-Conspirator #2 relayed this information to Co-Conspirator #4.   The defendant TIM LEISSNER understood and agreed with Co-Conspirator #2 and Co-Conspirator #4 not to disclose this information to personnel

within the Compliance Group, the Intelligence Group or the committees within U.S. Financial Institution #1 that would review Project Magnolia and other 1MDB transactions.

28.    In or around March 2012, 1MDB chose U.S. Financial Institution #1 to be the sole bookrunner and arranger for the $1.75 billion debt financing transaction designed, in part, to pay for the acquisition of Malaysian Energy Company A, which was guaranteed by Foreign Agency A.    This transaction was referred to internally at U.S. Financial Institution #1 as "Project Magnolia."

29.    Following U.S. Financial Institution #1's formal engagement to work on Project Magnolia, the defendant TIM LEISSNER continued to conspire with others, including Co-Conspirator #2 and other employees and agents of U.S. Financial Institution #1, to work with Co-Conspirator #1 on the transaction.

30.    In or around March 2012, the defendant TIM LEISSNER, Co-Conspirator #1, Co-Conspirator #2, Co-Conspirator #4 and 1MDB officials traveled to Abu Dhabi to meet with officials of Foreign Agency A and Foreign Investment Firm A to discuss the guarantee for Project Magnolia.    Throughout that time, LEISSNER knew Co-Conspirator #1 arranged the meetings with the officials of Foreign Agency A and Foreign Investment Firm A, and that some of these officials, among others, would be paid bribes by Co-Conspirator #1 to influence the approval of the guarantee.    LEISSNER also knew that Co-Conspirator #3 would be promised and paid bribes to acquire the approvals and documentation of the guarantee for the bond.

31.    As part of their plan, the defendant TIM LEISSNER and others, including Co-Conspirator #2, also knew that Co-Conspirator #1 would pay and caused to be paid bribes and kickbacks to influence Malaysian officials to obtain the necessary approvals

to execute Project Magnolia for U.S. Financial Institution #1. During the months leading up to the issuance of Project Magnolia, LEISSNER knew that Co-Conspirator #1 enlisted 1MDB officers, including 1MDB Official #3, to assist him in ensuring that all necessary approvals were obtained from 1MDB officials and others to complete the transaction, in exchange for bribes and kickbacks to those 1MDB officers.

32.     In or around the end of May 2012, near the closing of Project Magnolia, the defendant TIM LEISSNER continued to conspire with others, including Co-Conspirator #1 and Co-Conspirator #2, to divert some of the funds from Project Magnolia into the bank accounts of shell companies that LEISSNER, Co-Conspirator #1, Co-Conspirator #2 and others beneficially owned and controlled. At this time, LEISSNER, Co-Conspirator #1 and Co-Conspirator #2 understood and expected to keep some of the diverted funds for their personal use, and that other funds would be used to pay bribes and kickbacks to government officials in Malaysia and Abu Dhabi and elsewhere in exchange for their assistance in obtaining and retaining business for U.S. Financial Institution #1 with respect to the execution of the bond transaction and the purchase of Malaysian Energy Company A.

33.     On or about May 21, 2012, Project Magnolia closed, earning significant fees for U.S. Financial Institution #1, and resulting in large year-end bonuses paid by U.S. Financial Institution #1 to the defendant TIM LEISSNER, Co-Conspirator #2 and other employees and agents of U.S. Financial Institution #1 who participated in obtaining and structuring the bond deal. LEISSNER and other employees and agents of U.S. Financial Institution #1 intentionally structured Project Magnolia, and future transactions, as bond deals rather than other forms of financing, because doing so generated much higher revenues and fees for U.S. Financial Institution #1, improved the bank's reputational standing in both the

Southeast Asian region and globally and provided LEISSNER and other bankers with increased remuneration and professional prestige, even though the bond financing was more expensive for 1MDB.

34.    U.S. Financial Institution #1 transferred the proceeds of the Magnolia bond offering via wire to 1MDB's wholly-owned subsidiary, from a place within the United States to and through a place outside of the United States, including through the Eastern District of New York. At the time, the defendant TIM LEISSNER, Co-Conspirator #1, Co-Conspirator #2 and others knew that a large portion of the proceeds of the bond would be diverted to themselves and others, including government officials, through shell companies beneficially owned and controlled by themselves and others.

35.    Within three months of the closing of Project Magnolia, millions of dollars of bond proceeds were transferred through shell companies beneficially owned and controlled by Co-Conspirator #1 and other co-conspirators into a Hong Kong bank account in the name of Holding Company #1 ("Holding Company #1 Account"), and these funds were wire transferred to and from the United States. Holding Company #1 was a shell company incorporated in the British Virgin Islands that was owned by Co-Conspirator #5 and was controlled by both the defendant TIM LEISSNER and Co-Conspirator #5. Some of these funds were subsequently transferred to Co-Conspirator #2. LEISSNER and Co-Conspirator #5 also used a portion of these funds for their personal use and enjoyment. Other bond funds from Project Magnolia were transferred through shell company accounts beneficially owned and controlled by Co-Conspirator #1 and other co-conspirators and ultimately into accounts of shell companies beneficially owned and controlled by Abu Dhabi Official #1, Co-Conspirator #3 and Co-Conspirator #3's relative.

## PROJECT MAXIMUS

36.    In or about May 2012, the defendant TIM LEISSNER, Co-Conspirator #1, Co-Conspirator #2 and others began to plan a second bond transaction, known internally at U.S. Financial Institution #1 as "Project Maximus," which was designed, in part, to raise capital for 1MDB to purchase a second Malaysian power generation company.  LEISSNER, Co-Conspirator #1, Co-Conspirator #2 and others knew Co-Conspirator #1 and others would and did pay bribes and kickbacks to influence Malaysian and Abu Dhabi officials to obtain the necessary approvals to execute the bond offering.  The mandate for this bond offering was also awarded by 1MDB to U.S. Financial Institution #1, and it was structured similarly to the first bond issuance but with an indirect guarantee from Foreign Agency A.

37.    As with Project Magnolia, while the defendant TIM LEISSNER, Co-Conspirator #2 and others continued to work with Co-Conspirator #1 to acquire this business for U.S. Financial Institution #1 and to execute the second bond issuance, they concealed Co-Conspirator #1's involvement in the transaction from the Compliance Group and Intelligence Group at U.S. Financial Institution #1 for the same reasons that they concealed his involvement with Project Maximus.

38.    The defendant TIM LEISSNER, Co-Conspirator #1, Co-Conspirator #2 and others knew that a large portion of the proceeds of Project Maximus would be illegally diverted to themselves and others, including government officials, through shell companies beneficially owned and controlled by themselves and others.  LEISSNER knew at the time that Malaysian Official #1, government officials from Abu Dhabi and 1MDB officials, among others, would receive money from the proceeds of Project Maximus that passed through various shell companies beneficially owned and controlled by himself, Co-

Conspirator #1 and others to influence those officials to execute the bond with U.S. Financial Institution #1. Abu Dhabi Official #1 and a close relative of Malaysian Official #1, among others, received some of these funds.

39.    Project Maximus closed on or about October 17, 2012, raising approximately $1.75 billion for a 1MDB wholly-owned subsidiary, and resulting in substantial revenues and other fees for U.S. Financial Institution #1. U.S. Financial Institution #1 wire transferred the proceeds of Project Maximus to the subsidiary of 1MDB from a place within the United States to and through a place outside of the United States, including through the Eastern District of New York. Thereafter, some of the proceeds from the bond offering were diverted and transferred to a place in the United States from and through a place outside of the United States, and from a place in the United States to and through a place outside of the United States, including through the Eastern District of New York.

40.    The defendant TIM LEISSNER knew that some of the funds from Project Maximus were transferred by Co-Conspirator #1 or at his request to the Holding Company #1 Account in furtherance of the scheme. Thereafter, LEISSNER, Co-Conspirator #1, Co-Conspirator #2 and others caused some of these funds to be transferred to the accounts of 1MDB officials or relatives of such officials, or to the accounts of shell companies beneficially owned by 1MDB officials, including 1MDB Official #1 and 1MDB Official #2, in exchange for their assistance in obtaining and retaining business for U.S. Financial Institution #1.

## PROJECT CATALYZE

41.     In or about November 2012, despite having raised over $3 billion in the prior 11 months, 1MDB sought to raise an additional $3 billion through a bond issuance known internally at U.S. Financial Institution #1 as "Project Catalyze." This bond issuance was purportedly designed to fund 1MDB's portion of a joint venture with Foreign Investment Firm A. U.S. Financial Institution #1 was engaged on the project in or around early 2013, and again, secured substantial revenues and fees from the deal.

42.     As they had with the two prior 1MDB bond issuances, the defendant TIM LEISSNER, Co-Conspirator #4 and others continued to work with Co-Conspirator #1 as an intermediary between U.S. Financial Institution #1, 1MDB officials, Malaysian Official #1 and other government officials, and they continued to conceal this fact from the Compliance Group, Intelligence Group and committees at U.S. Financial Institution #1. Further, although required by internal policies of U.S. Financial Institution #1, LEISSNER failed to disclose that he and Co-Conspirator #2 had received a portion of the funds diverted from the prior bond transactions via Co-Conspirator #1 and that Leissner, Co-Conspirator #1 and others had caused bribes and kickbacks to be paid to 1MDB officials and others who were involved in the transactions.

43.     The Project Catalyze bond issued on or about March 19, 2013. Some of the approximately $3 billion raised by this bond issuance was transferred to the defendant TIM LEISSNER and Co-Conspirator #5 at the Holding Company #1 Account by or at the direction of Co-Conspirator #1. These diverted and stolen funds were transferred to a place in the United States from and through a place outside of the United States, and from a place in the United States to and through a place outside of the United States.

44.     Following the closing of Project Catalyze, through the end of 2014, the defendant TIM LEISSNER and U.S. Financial Institution #1 sought, obtained and worked to execute several additional transactions with 1MDB, particularly focusing on a proposed initial public offering ("IPO") of 1MDB's energy assets ("1MDB Energy").   Throughout the time period of these additional transactions, LEISSNER and his co-conspirators continued to pay bribes and kickbacks to certain 1MDB officials and others, including from the proceeds of the Project Catalyze bond and other 1MDB transactions, to influence those officials to award a role for U.S. Financial Institution #1 in the IPO.   These bribes and kickbacks included transferring millions of dollars to the accounts of shell companies beneficially owned and controlled by 1MDB Official #2 and 1MDB Official #3, and transferring approximately $1.3 million to the account of a New York jeweler to pay for jewelry for the wife of Malaysian Official #1.

45.     Between in or around June 2012 and October 2014, more than $200 million of the proceeds of the three 1MDB bonds and other 1MDB business was transferred by Co-Conspirator #1 or at his direction into accounts beneficially owned and controlled by the defendant TIM LEISSNER and Co-Conspirator #5.

COUNT ONE
(Conspiracy to Violate the FCPA)

46.     The allegations contained in paragraphs one through 45 are realleged and incorporated as if fully set forth in this paragraph.

47.     In or about and between January 2009 and October 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant TIM LEISSNER, together with others, did knowingly and willfully conspire to commit offenses against the United States, namely:

(a)     being an employee and agent of an issuer, and being an employee and agent of a domestic concern, and while in the territory of the United States, to willfully and corruptly make use of the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to one or more foreign officials, and to one or more persons, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to one or more foreign officials, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist LEISSNER, U.S. Financial Institution #1, Subsidiary A and others in obtaining and retaining business, for and with, and directing business to, LEISSNER, U.S. Financial Institution #1, Subsidiary A and others, contrary to the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-2, 78dd-3, 78ff(a) and 78ff(c)(2)(a); and

(b)     to knowingly and willfully circumvent and cause to be circumvented a system of internal accounting controls at U.S. Financial Institution #1, contrary to the FCPA, Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5) and 78ff(a).

48.    In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant TIM LEISSNER, together with others, committed and caused to be committed, among others, the following:

OVERT ACTS

(a)    On or about January 23, 2012, using personal Yahoo and Gmail email addresses, Co-Conspirator #1 introduced LEISSNER and Co-Conspirator #2 to a high-ranking official of 1MDB.   Co-Conspirator #1 wrote, "Making an introduction to [LEISSNER] and [Co-Conspirator #2's] private email accounts as discussed . . . .   Please exclude me from the email list going forward;"

(b)    On or about March 25, 2012, LEISSNER, Co-Conspirator #1, Co-Conspirator #2 and others met together in California and New York to discuss, among other things, matters related to Project Magnolia;

(c)    On or about October 10, 2012, at a meeting of a relevant committee of U.S. Financial Institution #1 that included members participating by phone or other electronic devices from multiple locations globally, including New York, New York, LEISSNER told the committee affirmatively that Co-Conspirator #1 was not involved in Project Maximus, though he knew that this statement was false at the time;

(d)    On or about July 29, 2013, LEISSNER caused $1 million of the proceeds of Project Catalyze to be wire transferred from the Holding Company #1 Account through a U.S. correspondent bank to the bank account of an entity beneficially owned and controlled by 1MDB Official #2;

(e)    On or about October 10, 2014, LEISSNER caused approximately $4.1 million to be wire transferred from a foreign bank account controlled by

himself and Co-Conspirator #5 to the U.S. bank account of a New York jeweler in part to pay for jewelry for the wife of Malaysian Official #1.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

### COUNT TWO
(Conspiracy to Commit Money Laundering)

49.     The allegations contained in paragraphs one through 45 are realleged and incorporated as if fully set forth in this paragraph.

50.     In or about and between January 2009 and October 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant TIM LEISSNER, together with others, did knowingly and intentionally conspire to:

(a)     transport, transmit and transfer monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, (i) with the intent to promote the carrying on of specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-2, 78dd-3, 78m(b)(5) and 78ff(a), and offenses against a foreign nation involving the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian Penal Law, contrary to Title 18, United States Code, Section 1956(a)(2)(A); and (ii) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of

the specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-2, 78dd-3, 78m(b)(5) and 78ff(a), and offenses against a foreign nation involving the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian Penal Law; contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i); and

     (b)  engage in one or more monetary transactions within the United States involving property of a value greater than $10,000 that is derived from specific unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-2, 78dd-3, 78m(b)(5) and 78ff(a), and offenses against a foreign nation involving the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian Penal Law, knowing that the funds were the proceeds of some unlawful activities and were in fact proceeds of some unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-2, 78dd-3, 78m(b)(5) and 78ff(a), and offenses against a foreign nation involving the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian Penal Law, contrary to Title 18, United States Code, Section 1957(a).

    (Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ONE

   51.  The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit

any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense.

52. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT TWO

53. The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any and all property, real or personal, involved in such offense, or any property traceable to such property.

54. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any

other property of the defendant, up to the value of the forfeitable property described in this

forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b); Title 21, United

States Code, Section 853(p))


RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK


DEBORAH L. CONNOR
ACTING CHIEF
CRIMINAL DIVISION, MONEY LAUNDERING
AND ASSET RECOVERY SECTION
U.S. DEPARTMENT OF JUSTICE


SANDRA L. MOSER
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

F. #2016R00467

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

## CRIMINAL DIVISION

### THE UNITED STATES OF AMERICA

*vs.*

*Tim Leissner,*

Defendant.

# INFORMATION

(T. 18, U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1), 982(b), 1956(h) and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____

                                                 *Foreperson*

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ *day,*

*of* _ _ _ _ _ _ _ _ _ _ _ _ _ *A.D. 20* _ _ _ _ _

_____

                                                    *Clerk*

*Bail, $* _ _ _ _ _ _ _ _ _ _ _

_____

*Jacquelyn M. Kasulis and Drew Rolle, Assistant U.S. Attorneys*
*(718) 254-6103/6783*