**C&G**  **COHEN & GRESSER LLP**

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
(212) 957 7601
mcohen@cohengresser.com

May 15, 2025

**VIA ECF**

The Honorable Margo K. Brodie, U.S.D.J.
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: _United States v. Leissner_, 18-CR-439 (MKB)

Dear Chief Judge Brodie:

Pursuant to this Court's ECF Order dated May 13, 2025, we respectfully submit on behalf of our client Xavier Justo this letter seeking restitution pursuant to the Mandatory Victims Restitution Act ("MVRA") and the Crime Victims' Rights Act ("CVRA") in connection with the sentencing of Defendant Tim Leissner in the above-captioned action.

Mr. Leissner has portrayed himself as an ambitious banker who simply benefited from Goldman Sachs's ("Goldman") 1Malaysia Development Berhad ("1MDB") bond deals. In reality, he was an architect of the 1MDB scheme—helping to establish 1MDB's predecessor; devising the original bond fraud; and facilitating the ongoing cover-up of the scheme as a whole. By his own sworn admissions, Mr. Leissner participated in the scheme for nine years, leveraging the might of his co-conspirators Jho Low and Najib Razak—specifically, their political clout and ability to squash any investigation into 1MDB to shield him personally and the scheme as a whole.

Mr. Justo is here because he got in the way of Mr. Leissner's and his co-conspirators' plans after he shared critical documents with a journalist that exposed the criminal nature of the 1MDB scheme. Mr. Justo manifested the precise risk that Mr. Leissner and his co-conspirators had for years identified and successfully managed: that someone would bring to light the fact that 1MDB was nothing more than a vehicle for the theft and misuse of billions of dollars. For taking public the necessary information that exposed 1MDB for what it was—a fraud—Mr. Justo suffered harms that were foreseeable to Mr. Leissner, who admittedly relied on his co-conspirators—in particular Malaysia's Prime Minister Najib Razak—to squash any investigation of 1MDB and discredit and silence journalists and their sources who could expose the truth about 1MDB. Razak's influence over, and involvement in, ensuring Mr. Justo's continued confinement is evident. As a result, Mr. Justo was forced to fund a battle for his freedom and restrained to a prison cell for a year and a half, resulting in the loss of his businesses.



The Honorable Margo K. Brodie
May 15, 2025
Page 2

     Mr. Justo has waited a long time for this opportunity to be made whole.  For the reasons below, we respectfully ask the Court to award Mr. Justo restitution of $18,266,909.31, which includes (i) $128,500 in costs directly flowing from Mr. Justo's unlawful incarceration, (ii) $9,525,726 in lost property, (iii) $1,054.02 in expenses incurred during participation in the 1MDB investigation, and (iv) $8,611,629.29 in pre-judgment interest.

## BACKGROUND

     On August 28, 2018, Mr. Leissner pled guilty to broad conspiracies to violate the Foreign Corrupt Practices Act ("FCPA") and to launder money by paying bribes and kickbacks to obtain and retain hundreds of millions of dollars in business from 1MDB for his employer, Goldman, and by unlawfully using the U.S. financial system to channel the proceeds.[1]  Through his plea, Mr. Leissner agreed to pay restitution for the full amount of victims' losses in an amount to be determined at sentencing.[2]

### A.     Mr. Leissner's Role

     Mr. Leissner and his co-conspirators concealed a years-long, worldwide scheme.  As a top Goldman banker in Asia, Mr. Leissner capitalized on Goldman's desire at the time to "Be Goldman in More Places" by increasing its footprint in emerging markets like Southeast Asia and the Middle East.[3]  Together with powerful key players in those markets—a Prime Minister with access to Malaysia's sovereign wealth fund and a master deal closer with strong ties to government officials, Mr. Leissner remained at the forefront of one of the world's largest kleptocracy schemes, specifically through underwriting fraudulent bond offerings for 1MDB.  Its magnitude is evidenced in the Department of Justice's civil complaint for forfeiture of assets associated with the various, overlapping phases of the 1MDB scheme.[4]

     The Goldman relationship was critical to legitimize 1MDB and the actions of Mr. Leissner's co-conspirators, Jho Low and Najib Razak, who directed all the transactions with 1MDB.[5]  Mr. Low was a graduate of the University of Pennsylvania's Wharton School and socialite who had close ties to powerful government officials in the Middle East and Asia;

---

[1]    *See generally* Transcript of Plea Hearing of Tim Leissner, *United States v. Leissner*, No. 18-CR-439 (MKB) (E.D.N.Y. Aug. 28, 2018), ECF No. 47-1 ("Plea Hr'g Tr.").

[2]    Plea Hr'g Tr. at 25:18-27:23.

[3]    Shira Ovide, *Goldman Sachs Strategy: 'Be Goldman in More Places,'* Wall St. J., Dec. 20, 2010, https://www.wsj.com/articles/BL-DLB-30007.

[4]    *See* Third Am. Compl., *United States v. All Funds Constituting Arbitration Award in* PetroSaudi v. PDVSA *UNCITRAL Arbitration*, No. 2:20-CV-8466 (C.D. Cal. July 6, 2021), ECF No. 90 ("*All Funds* Compl.").

[5]    In the Information, Mr. Low is Co-conspirator #1 and Prime Minister Razak is Malaysian Official #1.  *See also* Trial Transcript of Roger Ng at 460:25-462:4, *United States v. Hwa*, No. 18-CR-538 (MKB) (E.D.N.Y. Feb. 16, 2022) ("Ng Trial Tr."); Plea Hr'g Tr. at 38:4-7.



The Honorable Margo K. Brodie
May 15, 2025
Page 3

Mr. Razak was the Malaysian Prime Minister and Minister of Finance and, as Chairman of the 1MDB Board, he was the ultimate decisionmaker for 1MDB and the transactions into which it entered.  Mr. Low brought Mr. Leissner and his direct report, Roger Ng, into the 1MDB conspiracy to use Goldman to set up Terengganu Investment Authority ("TIA"), which would later become 1MDB.[6]  Goldman's involvement legitimized 1MDB as a credible new Malaysian sovereign wealth fund.  Mr. Leissner admitted to deceiving Goldman compliance concerning Mr. Low's involvement.  As part of his crimes, Mr. Leissner would personally facilitate billions of dollars in fraudulent bond transactions between Goldman and 1MDB so that he and his co-conspirators could profit billions of dollars in kickbacks.

Mr. Leissner was central to the 1MDB conspiracy.  He advised on the formation of TIA, resulting in a modest fee to Goldman, which typically would not justify Goldman's involvement—unless someone like Mr. Leissner took the long view.[7]  After establishing TIA, Mr. Leissner and Mr. Ng leveraged Mr. Low's connections to government officials in Malaysia, including its then-prime minister, to pursue government projects for Goldman.[8]  In 2012 and 2013, Mr. Leissner was central to structuring and executing three major bond issuances for 1MDB—Projects Magnolia, Maximus, and Catalyze—which raised $6.5 billion.[9]  The stated objective of Magnolia and Maximus was to raise funds for 1MDB to acquire energy and infrastructure projects intended to benefit the Malaysian public.[10]  But in reality, the majority of the funds were used for bribes and kickbacks and, in the case of Catalyze, to corruptly funnel funds to support Prime Minister Najib Razak's re-election campaign, which was critical to the continuation and ongoing concealment of the scheme for the next five years by securing Prime Minister Najib Razak's re-election.[11]

From the start of 1MDB, Mr. Leissner, Mr. Ng, and their co-conspirators sought to expand the scope of their criminal enterprise, including initially to profit from a fraudulent joint venture between 1MDB and an oil services company called PetroSaudi, in which Mr. Justo's then-friend, Tarek Essam Ahmad Obaid and his associate, Patrick Mahony, were shareholders or managers.  Having established the vehicle that became 1MDB, Mr. Leissner and Mr. Ng planned

---

[6]   Information ¶¶ 21-22, *United States v. Leissner*, No. 18-CR-439 (MKB) (E.D.N.Y. Aug. 28, 2018), ECF No. 16.

[7]   *See* Ng Trial Tr. (Feb. 16, 2022) at 421:7-10; *id.* (Feb. 22, 2022) at 584:7-586:4.

[8]   *See* Ng Trial Tr. (Feb. 22, 2022) at 613:21-615:4.

[9]   *See* Ng Trial Tr. (Feb. 16, 2022) at 382:10-16.

[10]   Ng Trial Tr. (Feb. 16, 2022) at 400:1-11.

[11]   *Id.*;  Emir Zainul & Timothy Achariam, *1MDB funds were used for Umno's election campaign during GE13, ex-CEO claims,* The Edge Malaysia (Sept. 15, 2020), https://theedgemalaysia.com/article/1mdb-funds-were-used-umnos-election-campaign-during-ge13-exceo-claims ("Former prime minister . . . Razak had used part of the US$3 billion raised by 1Malaysia Development Bhd (1MDB) . . . as part of . . . campaigning leading up to the 2013 General Elections.").



The Honorable Margo K. Brodie
May 15, 2025
Page 4

for Goldman to become involved with and ultimately profit off this critical initial arm of the 1MDB scheme through foreign exchange transactions in support of 1MDB's $1 billion investment in 1MDB's joint venture with PetroSaudi.[12] Their efforts were initially unsuccessful, but eventually paid off when Goldman secured billions of dollars of business through 1MDB in three subsequent bond issuances.

As part of later efforts to conceal the misuse of the $1 billion investment in PetroSaudi, Mr. Leissner attempted to leverage his investment banking connections to obtain a $1 billion valuation of PetroSaudi-owned drillships and related contracts (previously overseen by Mr. Justo during his time at PetroSaudi, as detailed below) that were worth only a fraction of that cost.[13] When that effort failed, the co-conspirators instead concocted opaque and empty transactions that allowed 1MDB to artificially inflate the value of these assets.[14] Then, through Project Catalyze, Mr. Leissner and Goldman structured and underwrote $3 billion of bonds with a stated purpose to invest in a joint venture with a wholly owned, indirect subsidiary of the Abu Dhabi government.[15] In reality, in addition to supporting Prime Minister Najib Razak's re-election, those funds were used to repay loans 1MDB had obtained to conceal losses from its PetroSaudi investment.[16] With the press and 1MDB's auditors, KPMG, raising questions about the legitimacy of the PetroSaudi deal and the mounting pressure to conceal massive losses, concealment was an ongoing priority.

Indeed, Mr. Leissner testified repeatedly at Mr. Ng's trial that one of the largest threats to the scheme was "criticism in the press and questions from the press" around 1MDB's transactions.[17] The "highly critical" media attention was a "recurring" subject of concern with

---

[12]   *See* Ng Trial Tr. (Feb. 22, 2022) at 634:11-635:24; 637:18-639:23.  Mr. Leissner testified during Mr. Ng's trial about his role in trying to procure business from PetroSaudi and about his belief that his co-conspirators—Mr. Low and Prime Minister Razak—profited from business transactions with PetroSaudi through 1MDB.  *See id.* at 637:18-639:23.

[13]   X. Justo Decl. ¶¶ 21; *see also All Funds* Compl. ¶¶ 133-48.

[14]   X. Justo Decl. ¶ 21 (describing Bridge Global transactions through Brazen Sky); *see also All Funds* Compl. ¶¶ 133-48.

[15]   *See* Information ¶ 41; *All Funds* Compl. ¶ 296.

[16]   Ng Trial Tr. (Feb. 16, 2022) at 400:1-11; *All Funds* Compl. ¶¶ 100-02, 129-30; Emir Zainul & Timothy Achariam, *1MDB funds were used for Umno's election campaign during GE13, ex-CEO claims,* The Edge Malaysia (Sept. 15, 2020), https://theedgemalaysia.com/article/1mdb-funds-were-used-umnos-election-campaign-during-ge13-exceo-claims (Project Catalyze funds were used for Razak's election expenses, as well as "to repay debt to Standard Chartered which was previously borrowed to fund 1MDB's investments in Petro Saudi").

[17]   *See, e.g.,* Ng Trial Tr. (Feb. 24, 2022) at 1005:11-13; *id.* at 1124:6-9 (testifying as to concern about "any press around these deals").



The Honorable Margo K. Brodie
May 15, 2025
Page 5

Mr. Leissner and his co-conspirators.[18]  Mr. Leissner explained that he received comfort, however, from his co-conspirator Prime Minister Razak's power and ability to "diminish or squash any kind of investigation that could happen otherwise around 1MDB and the bonds," which was key to the continued concealment of the scheme and the ill-gotten gains.[19]  Mr. Leissner further testified that he and his co-conspirators attempted to discredit journalist Clare Rewcastle Brown's articles in the well-known *Sarawak Report* that threatened the 1MDB scheme through counternarratives and other countermeasures.[20]

## B.    Mr. Justo's Time at PetroSaudi

In early 2010, after PetroSaudi had secured the above-mentioned $1 billion 1MDB investment, Mr. Obaid and Mr. Mahony recruited Mr. Justo to work for PetroSaudi in its newly established London office.[21]  Mr. Justo had previously served as a director of various companies within the PetroSaudi group for several years.[22]

Mr. Justo was focused on PetroSaudi's operations in Venezuela, where he handled critical negotiations and deals for PetroSaudi.[23]  During his employment, Mr. Justo had minimal insight into PetroSaudi's finances, the PetroSaudi-1MDB joint venture, or any other aspect of 1MDB.[24]  Mr. Justo met Mr. Low two times during his tenure at PetroSaudi, and both times Mr. Justo was urged by Mr. Obaid and Mr. Mahony not to discuss business with Mr. Low.[25]  As time progressed, Mr. Justo's compensation fell far short of what he was promised, including months of missed salary and bonuses.[26]  In April 2011, Mr. Justo's relationship with Mr. Obaid

---

[18]  *See id.* at 1125:6-9 (testifying that Mr. Ng "expressed his concerns about the press as well, that, you know, was being highly critical of our deals. That did not feel comfortable to neither him nor myself."); *id.* at 1173:25-1174:3 (testifying that increasing negative media was discussed with Mr. Ng "all the time" as a "concern because it was really was [*sic*] a recurring thing").

[19]  *See id.* at 1124:8-1125:1 ("I drew some comfort at the time from the fact that Prime Minister Najib had one [*sic*] the election post Project Catalyze and that comfort sort of outweighed the concerns of the press. . . .  [H]ad he lost the election, the bond deals at 1MDB itself would have gone under great scrutiny. Reversely, since he won, he was able to, in my view, diminish or squash any kind of investigation that could happen otherwise around 1MDB and the bonds. So I took comfort that while there may be noise in the press, in actuality there was likely very little that was going to be done about those bonds and the kickback in the scheme that came from it.").

[20]  *See, e.g.*, Ng Trial Tr. (Feb. 22, 2022) at 1126:8-1127:10 (testifying that Jasmine Loo, former general counsel to 1MDB, was asking "for points to counter the claims that *Sarawak [R]eport* is making in the article").

[21]  Decl. of Xavier Justo, dated May 13, 2025 ("X. Justo Decl."), ¶¶ 13-15.  Mr. Obaid and Mr. Mahony have been convicted in Switzerland for their role embezzling more than a billion dollars from 1MDB.

[22]  X. Justo Decl. ¶¶ 10-11.

[23]  X. Justo Decl. ¶ 19.

[24]  X. Justo Decl. ¶¶ 16-18.

[25]  X. Justo Decl. ¶¶ 17-18.

[26]  X. Justo Decl. ¶ 22.



The Honorable Margo K. Brodie
May 15, 2025
Page 6

soured and Mr. Justo resigned.[27]  Mr. Justo and PetroSaudi agreed to 6.5 million Swiss Francs as severance to address, among other things, his unpaid compensation, reimbursable expenses, and the profit Mr. Justo's efforts had generated.[28]  Under threat that Mr. Obaid's lawyer would take action against him, however, Mr. Justo accepted an immediate payment of 4 million Swiss Francs, although he maintained he was due the remainder of the agreed-upon severance.[29]

By the time of his departure, Mr. Justo had become suspicious that all was not what it seemed at PetroSaudi.[30]  After observing the secretive nature of PetroSaudi's relationship with Mr. Low and PetroSaudi's refusal to pay Mr. Justo's agreed-upon severance, Mr. Justo became concerned that Mr. Obaid and others were withholding information from him.[31]  In light of his growing apprehensions concerning PetroSaudi's business operations, Mr. Justo wanted to be in a position, if needed, to prove he had no involvement in any questionable conduct.[32]  To that end, Mr. Justo procured a copy of the PetroSaudi server from PetroSaudi's IT manager, who had recently been instructed by Mr. Obaid to delete the server.[33]

In 2012, Mr. Mahony began attempting to recruit Mr. Justo back to PetroSaudi, acknowledging that PetroSaudi would make good on its obligation to pay him 2.5 million Swiss Francs in outstanding severance.[34]  These conversations unfolded over the next year and a half.[35]  Finally, in October 2013, Mr. Mahony and Mr. Justo met in Thailand, where Mr. Justo had moved, and discussed Mr. Justo's severance.[36]  Upon Mr. Mahony's request, Mr. Justo showed Mr. Mahony some of the PetroSaudi data in Mr. Justo's possession.[37]  PetroSaudi did not follow through on re-hiring Mr. Justo or its promise to pay Mr. Justo the remainder of his severance.[38]

---

[27]    X. Justo Decl. ¶¶ 23-24.

[28]    X. Justo Decl. ¶ 25.

[29]    X. Justo Decl. ¶¶ 26-27.

[30]    X. Justo Decl. ¶¶ 20-21, 28.

[31]    X. Justo Decl. ¶¶ 20-21, 28-29.

[32]    X. Justo Decl. ¶ 28.

[33]    X. Justo Decl. ¶¶ 28-29.

[34]    X. Justo Decl. ¶¶ 27, 35.

[35]    X. Justo Decl. ¶ 36.

[36]    X. Justo Decl. ¶ 37.

[37]    X. Justo Decl. ¶ 37.

[38]    X. Justo Decl. ¶ 37.



The Honorable Margo K. Brodie
May 15, 2025
Page 7

### C.    Mr. Justo Exposes the 1MDB Scheme

In spring 2014, the journalist Clare Rewcastle Brown contacted Mr. Justo to speak about PetroSaudi, 1MDB, and Malaysian government corruption.[39]  There had been growing suspicion around 1MDB and PetroSaudi in the press.  By fall 2014, the 1MDB scheme was on the brink of exposure and imminent collapse.  1MDB's auditor since 2010—KPMG—had refused to approve 1MDB's 2013 financial statements due to irregular activity with one of 1MDB's subsidiaries that held residual assets from the PetroSaudi investment.[40]  To avoid inevitable exposure, Mr. Leissner's co-conspirators engaged in a series of fraudulent transactions to disguise the irregularities that stemmed from the PetroSaudi deal and threatened to expose the entire 1MDB scheme and convinced a new auditor—Deloitte—to approve the financial statements.[41]

After several conversations, Mr. Justo shared documents from the PetroSaudi server with Ms. Rewcastle Brown who relied on those documents to publish "Heist of the Century" on *Sarawak Report* in February 2015.[42]  The article exposed Mr. Low for laundering money out of 1MDB through PetroSaudi and prompted investigations around the globe, ultimately leading to the U.S. Department of Justice charging Mr. Leissner and Mr. Ng and entering into plea or deferred prosecution agreements with multiple Goldman entities.[43]  Mr. Leissner was subpoenaed by the FBI and left Goldman in February 2016, but continued to engage in criminal conduct with Mr. Low and Prime Minister Razak in furtherance of the conspiracy.[44]

### D.    Mr. Leissner's Co-conspirators Retaliate Against Mr. Justo

On June 22, 2015, years after Mr. Justo's discussions with PetroSaudi regarding his re-employment and unpaid severance but only months after "Heist of the Century" was published, Mr. Justo was arrested in Thailand on trumped up charges—initiated by PetroSaudi—of attempted extortion and blackmail.[45]  He was ripped away from his family and the life they were building in Thailand.  While imprisoned, Mr. Justo received several visits from Mr. Mahony, the Malaysian police, and a purported Scotland Yard officer working with PetroSaudi to force six

---

[39]    X. Justo Decl. ¶ 39.

[40]    *See All Funds* Compl. ¶¶ 146-47; Ng Trial Tr. (Mar. 7, 2022) at 2116:6-16.

[41]    *All Funds* Compl. ¶¶ 147-48, 434-52, 882-97; Information ¶¶ 44, 48(e); Ng Trial Tr. (Feb. 16, 2022) at 387:16-24.

[42]    X. Justo Decl. ¶¶ 40-42.

[43]    *See, e.g.*, Mem. of Law in Supp of Def. Roger Ng's Mot. to Dismiss the Indictment at 11, 22-23, *United States v. Hwa*, No. 18-CR-538 (MKB) (E.D.N.Y. Nov. 20, 2020), ECF No. 50-1 ("Ng MTD") (characterizing Ms. Rewcastle Brown's article as "[t]he article breaking the story" of the 1MDB fraud).

[44]    Ng Trial Tr. (Feb. 16, 2022) at 379:9-380:13; Ng Trial Tr. (Feb. 24, 2022) at 959:23-960:24; 1134:13-1136:9; Ng Trial Tr. (Mar. 1, 2022) at 1265:22-1267:21; Information ¶ 1.

[45]    X. Justo Decl. ¶ 44.



The Honorable Margo K. Brodie
May 15, 2025
Page 8

false "confessions" by promising Mr. Justo that his only viable pathway to prompt exoneration and freedom was to admit these untrue accounts.[46]  PetroSaudi also hired Swiss and local Thai attorneys to handle press and replace the Thai counsel that initially represented Mr. Justo.[47]

The focus of the "confessions" and related orchestrated press coverage was undermining Ms. Rewcastle Brown's reporting in *Sarawak Report* to ensure that Mr. Leissner's co-conspirators, Mr. Low and Prime Minister Razak, would not be further exposed—which was part and parcel with the strategy Mr. Leissner and his co-conspirators earlier employed to discredit *Sarawak Report* stories that threatened 1MDB.[48]  Mr. Mahony separately told Mr. Justo and his wife that Prime Minister Razak was controlling Mr. Justo's fate.[49]  Within months of Mr. Justo's arrest, Prime Minister Razak began taking additional extreme measures to silence other 1MDB critics threatening to expose the scheme.[50]

In August 2015, Mr. Justo was convicted of blackmail in Thailand and sentenced to years in prison.[51]  During the later stages of his incarceration, Mr. Justo hired attorneys to help secure his release, which work occurred alongside the tireless efforts of his wife.[52]  Those efforts included an agreement to relocate Mr. Justo to Switzerland, but in 2016 Swiss authorities confirmed that Prime Minister "Razak took the opportunity of his official visit to Thailand and key talks on border cooperation, in order to personally interfere in the case of . . . Xavier Justo,"

---

[46]  X. Justo Decl. ¶¶ 55-56.

[47]  X. Justo Decl. ¶¶ 57, 61.

[48]  X. Justo Decl. ¶¶ 55-57; Ng Trial Tr. (Feb. 22, 2022) at 1126:8-1127:10 (Leissner testifying about co-conspirator's efforts to identify "points to counter the claims that *Sarawak [R]eport* is making in the article" that threatened the conspiracy).

[49]  X. Justo Decl. ¶¶ 52, 65, Decl. of Laura Justo, dated May 13, 2025 ("L. Justo Decl.") ¶¶ 14-15.

[50]  In July 2015, Prime Minister Razak removed the Deputy Prime Minister after he publicly called on Prime Minister Razak to answer questions about 1MDB.  At the same time, Malaysia's Attorney General, who was one of the leaders of a probe into 1MDB, was either removed from office or pressured to resign by Prime Minister Razak.  *See* Austin Ramzy, *Malaysia's Premier Dismisses Deputy and Attorney General Amid Scandal*, N.Y. Times, July 28, 2015, https://www.nytimes.com/2015/07/29/world/asia/amid-1mdb-scandal-najib-razak-dismisses-deputy-prime-minister-and-attorney-general.html; Oliver Holmes, *Former Malaysian attorney general planned charges against PM – report*, The Guardian, Mar. 28, 2016, https://www.theguardian.com/world/2016/mar/28/former-malaysian-attorney-general-planned-charges-against-pm-report.  Then, in August 2015, Malaysia issued an arrest warrant for journalist Clare Rewcastle Brown after she exposed Prime Minister Razak's receipt of $700 million from 1MDB into his personal bank account.  *See Refused! – INTERPOL Rejects Najib's 'Red Notice' Request Against Sarawak Report*, Sarawak Report, Aug. 28, 2015, http://www.sarawakreport.org/2015/08/refused-interpol-rejects-najibs-red-notice-request-against-sarawak-report/.

[51]  X. Justo Decl. ¶ 60.

[52]  X. Justo Decl. ¶ 73; L. Justo Decl. ¶ 22.



The Honorable Margo K. Brodie
May 15, 2025
Page 9

referring to the abrupt termination of the relocation agreement.[53]  Officials from the FBI tried to visit Mr. Justo while he was incarcerated in Thailand and, despite following procedure, were turned away.[54]  These officers viewed Mr. Justo as a potential witness in the 1MDB investigation and were perplexed by their inability to access him.[55]  Given this unusual restriction on access, Mr. Justo's wife traveled to London to share information with the FBI on Mr. Justo's behalf.[56]  Mr. Justo remained in a Thai prison for 18 months until he was granted an early release, along with 30,000 other inmates, on December 20, 2016.[57]  After his release and return to Switzerland, Mr. Justo was informed that he would be refused entry to Thailand for the next hundred years.[58]

Mr. Justo is grateful to have been reunited with his family, but he has yet to be made whole for the losses he suffered.  He incurred significant costs as a direct result of his unlawful incarceration, was unable to operate and forced to sell at a fraction of its value a luxury resort that he planned to operate in Thailand, lost business as a result of his conviction, and incurred expenses participating in the FBI's investigation of 1MDB that ultimately led to Mr. Leissner's conviction.

REQUEST FOR RESTITUTION

## I.    Mr. Justo is Entitled to Mandatory Restitution Under the MVRA

"The 'primary and overarching' goal of the MVRA is 'to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being.'" *United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011).  Accordingly, the MVRA mandates that victims of qualifying criminal offenses must receive restitution from the defendant to make them whole for the losses they suffered as a result of the crime.

---

[53]    *See Confirmed – Najib Demanded That Thailand Should Not Release Justo!,* Sarawak Report, Sept. 17, 2016, https://www.sarawakreport.org/2016/09/confirmed-najib-demanded-that-thailand-should-not-release-justo/.

[54]    L. Justo Decl. ¶ 13.  One of the agents with whom Mrs. Justo corresponded and cooperated included an agent that participated in the Eastern District's investigation of Mr. Leissner's co-conspirator, Roger Ng.  *See, e.g.*, Statement of United States Attorney Breon Peace on the Verdict in U.S. v. Roger Ng, U.S. Attorney's Office for the Eastern District of New York (Apr. 8, 2022) https://www.justice.gov/usao-edny/pr/statement-united-states-attorney-breon-peace-verdict-us-v-roger-ng (listing FBI Supervisory Special Agent Robert Heuchling as part of the 1MDB investigatory team).

[55]    L. Justo Decl. ¶ 13.

[56]    L. Justo Decl. ¶¶ 35-41.

[57]    X. Justo Decl. ¶¶ 65-66.

[58]    X. Justo Decl. ¶ 67.



The Honorable Margo K. Brodie
May 15, 2025
Page 10

### A. Mr. Leissner Pled Guilty to a Qualifying Offense Under the MVRA

The MVRA requires restitution for any "offense against property under [Title 18] . . . including any offense committed by fraud or deceit . . . in which an identifiable victim or victims has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1). Mr. Leissner pled guilty to conspiracies with Mr. Low and former Prime Minister Razak, among others, to violate the FCPA and launder money by paying bribes and kickbacks for hundreds of millions of dollars in business from 1MDB for Goldman and by unlawfully using the U.S. financial system to conceal the proceeds.[59] By his own admission, Mr. Leissner participated in the conspiracy for years, including after murmurings about 1MDB that led to an internal Goldman investigation resulting in Goldman firing Mr. Leissner.[60] As Mr. Leissner acknowledged, he is required to make restitution under the MVRA because he pled guilty to these crimes against property under Title 18.[61]

### B. Mr. Justo is a Victim Under the MVRA

Mr. Justo is a victim of Mr. Leissner's FCPA and money laundering conspiracies. The MVRA defines a "victim" as "a person directly and proximately harmed as a result of the commission of [the] offense . . . including, . . . any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

### (i) Mr. Leissner Pled Guilty to a Broad Conspiracy

Restitution is properly ordered when the conduct harming the victim is "a significant part of the greater fraud"—in other words, restitution is proper for losses incurred *in service of* the offense of conviction. *United States v. Paul*, 634 F.3d 668, 676-77 (2d Cir. 2011) (holding that victim's losses resulted from a "significant part of the greater fraud" to which defendant pled guilty). In conspiracy cases, "Congress broadened the scope of restitution from losses attributable solely to the offense of conviction to all losses caused in course of a defendant's criminal conduct, whether the defendant is convicted of each of those offenses or not." *United States v. Gioeli*, 2019 WL 6173421, at *7 (E.D.N.Y. Nov. 20, 2019) (quoting *United States v. Boyd*, 222 F.3d 47, 51 (2d Cir. 2000)); *see also United States v. Lucien*, 347 F.3d 45, 54 (2d Cir. 2003) (holding trial court lacked authority to consider unindicted co-conspirators as jointly and severally liable for restitution). This includes responsibility for "losses flowing from the reasonably foreseeable 'actions of that defendant's co-conspirators.'" *United States v. Goodrich*, 12 F.4th 219, 228 (2d Cir. 2021); *accord United States v. Bengis*, 631 F.3d 33, 42 n.3 (2d Cir.

---

[59]    *See generally* Plea Hr'g Tr.

[60]    Ng Trial Tr. (Feb. 16, 2022) at 379:9-380:13; Ng Trial Tr. (Feb. 24, 2022) at 959:23-960:24; 1134:13-1136:9; Ng Trial Tr. (Mar. 1, 2022) at 1265:22-1267:21; Sentencing Memorandum, ECF No. 87, at 2; Information ¶ 1 (noting Mr. Leissner remained employed at Goldman until early 2016).

[61] Plea Hr'g Tr. at 25:18-27:23.



The Honorable Margo K. Brodie
May 15, 2025
Page 11

2011) (although defendants pled guilty to illegal importation, not harvesting, of lobsters, holding that defendants' conduct—even though they did not "personally harvest[] the lobsters"— nonetheless deprived victim of property rights and provided basis for restitution). That is because, in the case of a conspiracy, the "essence" of the offense is the *agreement* to the "common plan of the conspiracy." *Goodrich*, 12 F.4th at 228-29 (emphasis in original). Thus, by virtue of Mr. Leissner's agreement to the conspiracies, restitution for all losses flowing from the reasonably foreseeable actions of his co-conspirators is "rooted in" Mr. Leissner's criminal conduct. *See id.* at 229; *United States v. Lebedev*, 932 F.3d 40, 57 (2d Cir. 2019), *abrogated in part on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023) (rejecting argument that restitution was improper because losses were caused "by conduct postdating the conspiracy for which he was convicted").

Mr. Leissner agreed to participate—and take a central role in—a broad, worldwide conspiracy that carried on for nearly a decade. As detailed above, Mr. Leissner was at the heart of the formation of 1MDB and Projects Magnolia, Maximus, and Catalyze.[62] But the real key to the criminal scheme was the perpetual concealment of the diversion and misappropriation of the billions in 1MDB's illicit proceeds. This led to the 1MDB conspiracy's longevity. With all transactions flowing through 1MDB, the scheme operated much like a classic integrated Ponzi scheme where losses associated with bribes and kickbacks extracted from prior transactions could only be covered by additional transactions, and exposure of any individual transaction presented an essential risk to the entire scheme.

The ongoing concealment of this broad conspiracy was a critical element of Mr. Leissner's offense of conviction, permeating every phase and aspect of the 1MDB conspiracy.[63] It was essential to the scheme that 1MDB continue to be accepted as a legitimate sovereign wealth fund with the full backing of the Malaysian state and Goldman. Mr. Low and Mr. Leissner conspired in the original formation of 1MDB, leveraging Mr. Leissner's role at Goldman to confer instant credibility on 1MDB, while Prime Minister Razak provided a cloak of Malaysian governmental authority and wielded the power to "diminish or squash" any attempts to question the scheme.[64] *See, e.g.*, *United States v. Berger*, 224 F.3d 107, 115 (2d Cir. 2000) (noting that "common purpose, overlapping participants, and mutual dependence" are hallmarks of a single overarching conspiracy); *Gioeli*, 2019 WL 6173421, at *8 (requiring defendant to pay restitution for uncharged or acquitted conduct when defendant was active in the enterprise, relied on his associates perpetuating the times, and knowingly profited from their actions)

Mr. Leissner directly participated in efforts to disguise losses of 1MDB, including some related to PetroSaudi. When Mr. Leissner was leading the bond issuances for Projects Magnolia and Maximus in 2012—to purchase energy and infrastructure assets—the losses stemming from

---

[62]    *See supra* Section A.

[63]    Plea Tr. 17:18-18:1; 38:12-39:2; 39:15-21; 39:22-40:9; Compl., ECF No. 1 ¶¶ 17, 45-49, 56-59, 66, 73-74.

[64]    Ng Trial Tr. (Feb. 24, 2022) at 1124:8-1125:9.



The Honorable Margo K. Brodie
May 15, 2025
Page 12

the bribes and kickbacks associated with the original PetroSaudi deal in 2009 remained unresolved.  Mr. Leissner tried to help but was unable to inflate PetroSaudi's assets sufficiently to cover the losses.[65]  Instead, 1MDB hid the PetroSaudi losses in a sham Cayman Fund structure, Bridge Global, in a subsidiary called Brazen Sky.[66]  Moreover, Mr. Leissner's and Goldman's underwriting of $3 billion of bonds through Project Catalyze also spawned the misuse of funds to support Prime Minister Najib Razak's reelection and cover up 1MDB's PetroSaudi losses.[67]  As another example, Mr. Leissner was involved with the 1MDB co-conspirators efforts to carefully monitor the press to prepare counterefforts to facilitate the silencing and undercutting of critics.[68]  Only on May 9, 2018, nine years after the formation of 1MDB, and the day Prime Minister Razak lost re-election in Malaysia and could no longer assert his authority in furtherance of the concealment of the conspiracy, did Mr. Leissner cash out.[69]

> **(ii)** **Mr. Justo Was Directly and Proximately Harmed by Mr. Leissner's Conspiracies**

Absent the FCPA and money laundering conspiracies that Mr. Leissner agreed to and actively participated in, Mr. Justo would not have been prosecuted and imprisoned.  As Mr. Mahony told Mrs. Justo, Prime Minister Razak had Mr. Justo jailed to cast doubt on the information he released to Ms. Rewcastle Brown that threatened revealing the prime minister's participation in 1MDB.[70]  The facts of his arrest bear this out.  Mr. Justo last met with Mr. Mahoney in October 2013 and no charges were brought for two years.  Yet, within months of the publication of "Heist of the Century," charges dating back to conduct from October 2013 surfaced.[71]  On a recorded call, Mr. Mahony confirmed to Mrs. Justo that Prime Minister Razak ultimately controlled Mr. Justo's imprisonment.  As reflected in Mrs. Justo's declaration and its Exhibit 5 transcribing that call, Mr. Mahony told her:  "There is a prime minster of a country [Najib Razak] who is in a mess;" "[t]his guy [Najib Razak], he continues to stress. It's his political career that is a bit in the shit here;" and "In the meantime, [we] continue to be in shit because of the media and only because of the media. So, if you want to help your husband, help

---

[65]   X. Justo Decl. ¶ 21.

[66]   X. Justo Decl. ¶ 21.

[67]   *See supra* notes 15-16 and accompanying text.

[68]   *See, e.g.*, Ng Trial Tr. (Feb. 24, 2022) at 1126:8-1127:10 (testifying that former 1MDB general counsel Jasmine Loo was asking for ways to discredit *Sarawak Report*'s claims).

[69]   In public filings with the SEC, Celsius Holdings, Inc. reported that "[o]n May 9, 2018, 100% of the membership interests in Midas Commodities Agents Delaware LLC were acquired by Newland Inc. Limited."  Celsius Holdings, Inc., Schedule 13G (May 9, 2018), sec.gov/Archives/edgar/data/1341766/000110465918034784/a18-13874_1sc13g.htm.  Leissner controlled Midas Commodities Agents and admitted to using it to conceal assets.  Ng Trial Tr. (Mar. 8, 2022) at 2289:19-2291:4.

[70]   X. Justo Decl. ¶¶ 52, 63; L. Justo Decl. ¶¶ 14-16.

[71]   X. Justo Decl. ¶¶ 35-38, 43.



The Honorable Margo K. Brodie
May 15, 2025
Page 13

me in the media."[72]  And the allegations underlying these charges against Mr. Justo amounted to nothing more than an employment dispute about unpaid severance.  A Thai political leader suspects that the then-Thai Prime Minister formed a "dark alliance with Malaysia" to coordinate the arrest of Mr. Justo in 2015 to prevent discovery of the 1MDB scheme.[73]  In other words, silencing Mr. Justo was the "cause in fact" of his wrongful incarceration and the resulting losses. *United States v. Marino*, 654 F.3d 310, 322-23 (2d Cir. 2011) (interpreting "directly" in § 3663A(a)(2) as requiring that defendant's conduct be "but for" cause or "cause in fact" of loss).

Further, Malaysian officials—specifically Mr. Leissner's co-conspirator Prime Minister Razak and those at his direction—exerted undue influence over Mr. Justo's prosecution and incarceration in Thailand, underscoring that Mr. Justo was detained to protect Mr. Leissner and his co-conspirators.  Mr. Justo was visited in Thai prison by Malaysian police, and his six highly publicized and obviously coerced "confessions" focused on discrediting Ms. Rewcastle Brown's reporting that could implicate Prime Minister Razak.[74]  Prime Minister Razak's influence continued during Mr. Justo's incarceration, when Swiss authorities confirmed that Prime Minister Razak visited Thailand to interfere with an agreement between Thailand and Switzerland to relocate Mr. Justo to his home country for the remainder of his incarceration.[75]

It was also reasonably foreseeable to Mr. Leissner that his co-conspirators would further the crimes of conviction by silencing anyone that threatened to expose the conspiracy.  *See, e.g.*, *United States v. Washington*, 434 F.3d 1265, 1266-70 (11th Cir. 2006) (police department and another property owner were MVRA victims as to property damaged during chase of defendant fleeing bank robbery because "the need to elude the police after the robbery is a likely and foreseeable outcome of the crime"); *United States v. Donaby*, 349 F.3d 1046, 1054 (7th Cir. 2003) (same).  Mr. Leissner testified that "all the articles" about Mr. Low made it more difficult to continue criminal conduct[76] and the success of the charged fraud depended upon avoiding or discrediting media attention and continued concealment of Mr. Low's involvement.[77]  In 2013, Mr. Leissner himself was already defending against stories circulating about Mr. Low's involvement with 1MDB.  At that time, Mr. Leissner blamed the "blogs in Malaysia" that

---

[72]  L. Justo Decl. ¶ 14 & Ex. 5.

[73]  *See* Reuters, *Banned Thai opposition party says junta helped 1MDB cover-up* (Feb. 23, 2020), https://www.reuters.com/article/world/banned-thai-opposition-party-says-junta-helped-1mdb-cover-up-idUSKCN20H0J7/ (Thai political leaders accusing the military junta and former Thai Prime Minister Prayut Chan of desperately seeking legitimacy following their 2014 coup by forming "a dark alliance with Malaysia" to arrest Mr. Justo in 2015).

[74]  X. Justo Decl. ¶¶ 55-58, 63.

[75]  X. Justo Decl. ¶ 65; L. Justo Decl. ¶ 15.

[76]  *See, e.g.*, Ng Trial Tr. (Mar. 6, 2022) at 2197 (testifying that "all the articles" around Mr. Low made it more difficult to continue criminal conduct).

[77]  *See, e.g.*, Plea Hr'g Tr. at 40:2-9; Ng Trial Tr. (Feb. 24, 2022) at 1159-61; Ng Trial Tr. (Mar. 8, 2022) at 2203-06.



The Honorable Margo K. Brodie
May 15, 2025
Page 14

"always try to link a young Chinese businessman, Jho Low, to 1MDB" and assuring his colleagues "[t]hat is not the case other than he was an advisor . . . to the King of Malaysia at the time of the creation of 1MDB."[78]  Mr. Leissner knew that efforts to manage this risk included the agreement among the co-conspirators to attempt to discredit the very journalist and publication that Mr. Justo released the PetroSaudi documents to: Ms. Rewcastle Brown of *Sarawak Report*.[79] Press risk remained strong even after Project Catalyze.  Mr. Leissner testified that he and Mr. Ng continued to fear "any linkage that could establish . . . the team that had been on the inside of . . . the scheme that involved Jho.  We did not want to have that raised in the public.  Because more questions asked means more investigations started and things like that."[80]  Then, around the time of Mr. Justo's jailing in 2015, Ms. Rewcastle Brown was also very close to exposing other frauds on 1MDB, including an approximately $700 million payment into Prime Minister Razak's personal bank account as a result of Mr. Leissner's 2013 Project Catalyze bond issuance.[81]

At the time of Mr. Justo's arrest in 2015, Mr. Leissner was still employed by Goldman and he and his co-conspirators continued to maintain that Goldman's 1MDB transactions were legitimate and to engage in criminal conduct in furtherance of the conspiracy, despite increasing press scrutiny.[82]  In fact, after publication of "Heist of the Century," Mr. Leissner and his co-conspirators' plans to hold an initial public offering for 1MDB's power assets to address the losses in 1MDB had to be put on hold.[83]  Mr. Leissner, in his own words, relied on his co-conspirators to "diminish or squash any kind of investigation that could happen otherwise around 1MDB and the bonds" so that "very little . . . was going to be done about those bonds." [84]  As a direct consequence, Mr. Justo incurred substantial losses and must now be made whole for those foreseeable injuries.  *See Paul*, 634 F.3d at 676-77 (holding that victim's losses resulted from "significant part of the greater fraud" to which defendant pled guilty); *United States v. Schwamborn*, 542 F. App'x 87, 88-89 (2d Cir. 2013) (defendant "directly and proximately"

---

[78]    Compl. ¶ 65, *United States v. Leissner*, No. 18-CR-439 (MKB) (E.D.N.Y. June 7, 2018), ECF No. 1.

[79]    *See, e.g.*, Ng Trial Tr. (Feb. 24, 2022) at 1126:8-1127:10 (testifying that former 1MDB general counsel Jasmine Loo was asking for ways to discredit *Sarawak Report*'s claims).

[80]    Ng Trial Tr. (Mar. 1, 2022) at 1257:17-1258:1, 1262:16-23 (testifying media coverage continued well after Project Catalyze).

[81]    Information ¶¶ 41-45; *All Funds* Compl. ¶¶ 295-98, 337-46; SENSATIONAL FINDINGS! – Prime Minister Najib Razak's Personal Accounts Linked To 1MDB Money Trail MALAYSIA EXCLUSIVE!, Sarawak Report, July 2, 2015, https://www.sarawakreport.org/2015/07/sensational-findings-prime-minister-najib-razaks-personal-accounts-linked-to-1mdb-money-trail-malaysia-exclusive/.

[82]    Ng Trial Tr. (Feb. 24, 2022) at 1134:13-1136:9; Ng Trial Tr. (Feb. 26, 2022) at 379:6-380:13; Ng Trial Tr. (Mar. 1, 2022) at 1259:6-14.

[83]    Ng Trial Tr. (Feb. 24, 2022) at 1130:15-19 (testifying that "on the 1MDB IPO of the energy assets, that continued for a while, but it didn't go through because from a timing perspective the newspaper articles and the noise around 1MDB had intensified at some point so much that it just could not be pursued anymore"); *see also All Funds* Compl. ¶¶ 378-80, 404-07.

[84]    *See* Ng Trial Tr. (Feb. 24, 2022) at 1124:8-1125:9.



The Honorable Margo K. Brodie
May 15, 2025
Page 15

caused losses under MVRA where the "risk of loss that [defendant] created . . . was 'within the zone of risk' concealed by the scheme").

**II.    Mr. Justo is Entitled to Restitution for the Full Amount of His Losses**

Under the MVRA, Mr. Justo is entitled to an amount equal to "the value of the property on the date of the damage, loss, or destruction" or "the value of the property on the date of sentencing," whichever is greater, 18 U.S.C. § 3663A(b)(1)(B)(i), and reimbursement for "expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense," 18 U.S.C. § 3663A(b)(4).  Property under the MVRA includes the loss of intangible property rights.  *See Bengis*, 631 F.3d at 42 n.3 (rejecting argument that "offenses against property" are limited to offenses against tangible property like money).  When valuing lost property, it is well-settled that the MVRA does not require a "mathematically precise" loss calculation.  *United States v. Gushlak*, 728 F.3d 184, 195 (2d Cir. 2013).  A "reasonable approximation of losses supported by a sound methodology" is sufficient.  *Id.* at 196.  Any "[u]ncertainties with respect to the amount in question should be resolved in favor of the victim in accord with the statutory focus on making the victim whole."  *United States v. Romano*, 2022 WL 2666914, at *5 (E.D.N.Y. July 11, 2022), *aff'd*, 2022 WL 17097587 (2d Cir. Nov. 22, 2022).

In this case, Mr. Justo is a victim of Mr. Leissner's broad conspiracies to violate the FCPA and launder the proceeds of that crime and suffered numerous losses that were directly and proximately caused by the conduct of Mr. Leissner's co-conspirators.  Mr. Justo is entitled to restitution of $18,266,909.31, which consists of the following components of loss that were the direct and proximate result of Mr. Leissner's criminal conspiracy.  This is a fraction of the $43.7 million forfeiture money judgment against Mr. Leissner, the Celsius shares he forfeited valued at more than $400 million, and the over $1 billion that has been repatriated to Malaysia to offset the billions stolen in the 1MDB scandal.[85]  Yet Mr. Justo, who wrongfully spent a year and a half in jail after courageously releasing the records that led to the revelation of one of the world's largest kleptocracy schemes, has yet to be made whole.

**A.    Mr. Justo is Entitled to Restitution for Unlawful Incarceration Costs**

Mr. Justo incurred approximately $128,500 fighting his unlawful incarceration, including lawyer and prison fees, travel and boarding costs for Mr. Justo's wife and son to visit him in Thai prison, costs to validate documents and organize journalists in furtherance of securing Mr. Justo's release, and additional staff to maintain Mr. Justo's luxury resort in his absence.

---

[85]    Sentencing Memorandum, ECF No. 87 at 5 (citing PSR ¶¶ 147, 164); U.S. Department of Justice, Justice Department Repatriates $1.4B Misappropriated 1MDB Funds to Malaysia (June 13, 2024), https://www.justice.gov/archives/opa/pr/justice-department-repatriates-14b-misappropriated-1mdb-funds-malaysia.



The Honorable Margo K. Brodie
May 15, 2025
Page 16

When the defendant's criminal conduct includes illegal acts that result in or impact a legal proceeding, or otherwise cause the victim to spend money, including for attorneys' fees or other similar costs, that loss is directly related to the crime of conviction and is recoverable under the MVRA. *See, e.g.*, *United States v. Avenatti*, 81 F.4th 171, 210-11 (2d Cir. 2023) (affirming restitution award including lawyer fees incurred prior to investigation of the crime); *United States v. Qurashi*, 2009 WL 10677000, at *21-22 (E.D.N.Y. Sept. 1, 2009) (allowing restitution for attorneys' fees paid by insurance companies defending themselves against "sham" civil lawsuits), *report and recommendation adopted*, 2009 WL 10677129 (E.D.N.Y. Sept. 30, 2009), *aff'd and remanded in part on other grounds*, 634 F.3d 699 (2d Cir. 2011); *United States v. Blackburn*, 9 F.3d 353, 358-59 (5th Cir. 1993) (where defendant was convicted of bank fraud scheme and "[f]iling a civil suit against [a] bank was part of that scheme," restitution properly included attorneys' fees as "a direct result of [defendant's] offense").

As in *Avenatti*, Mr. Leissner's conspiracy caused Mr. Justo to defend a court proceeding and incur substantial out-of-pocket expenses in connection therewith. As a direct and proximate result of the wrongful conduct of Mr. Leissner's co-conspirators, Mr. Justo had to "spend[] his own money" on fees that he would not have expended, but for the crime. *Avenatti*, 81 F.4th at 210-11. Unfortunately, Mr. Justo does not have records of every expense, but he and his wife have conservatively estimated to the best of their ability the total costs incurred, the majority of which are supported by the records they were able to identify and attach to their respective declarations submitted herewith. The Justos estimate that they incurred approximately $95,000 in lawyer and prison fees, $12,000 in travel and boarding costs for Mr. Justo's wife and son to visit him in Thai prison, $13,500 in costs to validate documents and organize journalists in furtherance of securing Mr. Justo's release, and $8,000 in additional staff to maintain the luxury resort in Mr. Justo's absence.[86] The records they have been able to identify and the explanation for the fees are included in the Justos' declarations.[87]

---

[86]    X. Justo Decl. ¶ 74; L. Justo Decl. ¶ 19. Undersigned counsel also represents Mrs. Justo, who, while Mr. Justo was incarcerated, incurred on his behalf some of the losses and expenses evidenced here, including pursuant to a power of attorney he executed in her favor. The MVRA both (i) allows a "family member" of a victim who is "incapacitated" to "assume the victim's rights under this section," 18 U.S.C. § 3663A(a)(2), and (ii) authorizes restitution to a "person who provided . . . compensation" "if a victim has received compensation from insurance *or any other source* with respect to a loss," *id.* § 3664(j)(1) (emphasis added). Mrs. Justo should be treated, for purposes of the restitution order, as standing in the shoes of Mr. Justo, irrespective of whether Mrs. Justo's losses and expenses on Mr. Justo's behalf are characterized as (i) an assumption of his rights while he was incarcerated and had limited to no ability to manage his finances, communicate with journalists, and generally exercise his freedoms, or (ii) an advancement for his losses for which restitution is appropriate. *See United States v. Douglas*, 525 F.3d 225, 254 (2d Cir. 2008) (holding restitution appropriate even when third party paid expenses paid directly on victim's behalf); *United States v. Hayward*, 359 F.3d 631, 642 (3d Cir. 2004) (affirming restitution award to parents of victim children for, *inter alia*, costs in obtaining return of victim children); *see also United States v. Bergstein*, 2018 WL 9539768, at *2 n.3 (S.D.N.Y. Sept. 20, 2018) (accepting assignment of restitution claim), *aff'd*, 788 F. App'x 742 (2d Cir. 2019).

[87]    X. Justo Decl. ¶¶ 74-81; L. Justo Decl. ¶¶ 19-24.



The Honorable Margo K. Brodie
May 15, 2025
Page 17

These expenses were entirely foreseeable to Mr. Leissner.  Mr. Leissner testified repeatedly that one of the largest threats to the scheme was "criticism in the press and questions from the press" around 1MDB's transactions.[88]  To avoid detection, Mr. Leissner admitted to knowing that his co-conspirators engaged in efforts to discredit the very journalist to whom Mr. Justo gave the PetroSaudi files and "diminish or squash any kind of investigation that could happen [] around 1 MDB and the bonds."[89]  Having narrowly averted exposure of 1MDB in late 2014 following Project Catalyze and Prime Minister Najib Razak's successful reelection by replacing 1MDB's auditors and further concealing the fraudulent nature of PetroSaudi's 1MDB investment, it was even more critical for Mr. Leissner and his co-conspirators that Mr. Justo be discredited to mitigate the impact of the articles published from his release of data incriminating 1MDB and Mr. Low.  Indeed, because of the interconnectedness of the scheme, exposure of any one piece of the scheme would quickly topple the whole thing.  Mr. Leissner cannot credibly argue that he did not know the risks at stake.  Mr. Leissner testified that as the conspiracy went on, the need to control the press and limit any questions about 1MDB became paramount.[90]  When "Heist of the Century" was published, Mr. Leissner's co-conspirator represented that the article broke the 1MDB fraud and was "emailed throughout the highest echelons of Goldman."[91]  This further heightened the need to totally eliminate the threat of publicity and investigative journalism to the conspiracy.  Consequently, Mr. Leissner could reasonably foresee that those working with Ms. Rewcastle Brown would suffer losses defending against efforts to discredit, diminish, or squash their attempts to expose 1MDB.  *See Schwamborn*, 542 F. App'x at 88-89 (defendant "directly and proximately" caused losses under MVRA where the "risk of loss that [defendant] created . . . was 'within the zone of risk' concealed by the scheme").

### B.    Mr. Justo is Entitled to Restitution for Lost Business Opportunities

Mr. Justo is entitled to restitution for the loss of business, including to compensate him for the loss of value, in his resort and his personal service business from the time he was wrongly incarcerated.  This loss of business was the direct and proximate result of the actions of Mr. Leissner's co-conspirators, which foreseeably harmed Mr. Justo and led to the forced, discounted sale of the resort and loss to Mr. Justo's personal service business.

---

[88]    Ng Trial Tr. (Feb. 24, 2022) at 1125:6-9 (testifying that Mr. Ng "expressed his concerns about the press as well, that, you know, was being highly critical of our deals. That did not feel comfortable to neither him nor myself."); *id.* at 1173:25-1174:3 (testifying that increasing negative media was discussed with Mr. Ng "all the time" as a "concern because it was really was [*sic*] a recurring thing").

[89]    Ng Trial Tr. (Feb. 22, 2022) at 1126:8-1127:10 (testifying that Jasmine Loo, former general counsel to 1MDB, was asking "for points to counter the claims that *Sarawak [R]eport* is making in [an] article"); Ng Trial Tr. (Feb. 24, 2022) at 1124:8-1125:1.

[90]    Ng Trial Tr. (Mar. 1, 2022) at 1257:17-1258:1, 1262:16-23 (testifying media coverage continued well after Project Catalyze).

[91]    Ng MTD at 11, 22-23.



The Honorable Margo K. Brodie
May 15, 2025
Page 18

Under the MVRA, a defendant is liable for harms "'within the zone of risk'" of the defendant's scheme. *Schwamborn*, 542 F. App'x at 88-89. Even where a defendant's acts are several steps removed from the ultimate outcome, the defendant must make the victim whole if the defendant is the "but for" cause and the resulting harm "proximately flowed" from the defendant's conduct. *Lebedev*, 932 F.3d at, 57; *see United States v. Glencore Inter. A.G.*, 2023 WL 2242469 at \*6 (S.D.N.Y. Feb. 27, 2023) (granting restitution for value of lost business caused by defendant's unlawful conduct); *United States v. OZ Africa Mgmt. GP, LLC*, 2019 WL 4199904, at \*6 (E.D.N.Y. Aug. 29, 2019) (restitution proper to victims who lose "intangible property rights" like opportunity to develop mining rights).

In *Lebedev*, the Second Circuit affirmed a restitution award to a claimant who was harmed by a chain of events that started with a bribe and ultimately led to the failure of a financial institution. In that case, the defendant, a chairman of a credit union, accepted bribes to allow a cryptocurrency exchange to name a majority of its directors and process its transactions through the credit union, which subsequently collapsed. 932 F.3d at 46-47. The district court concluded that, but for the bribery scheme, the credit union would not have begun to rely on fees from automated clearing house transactions and other unsafe practices, most of which were conducted by others after the bribe was paid and after the conspiracy for which the defendant was convicted. *Id.* at 57. The court ordered the defendant to pay restitution to the credit union's regulator for the losses it incurred when the credit union had to be taken over and liquidated. The Second Circuit rejected the defendant's argument on appeal that the restitution award was based on losses that were too remote in time and unrelated to the charged conduct, holding that it was within the district court's discretion to conclude that the credit union's "financial difficulties proximately flowed from" the bribery. *Id.*

Here too, the losses to Mr. Justo proximately flowed from Mr. Leissner's criminal conspiracy, which included wrongfully subjecting Mr. Justo to criminal proceedings and discrediting him to squash discovery of the scheme. As set forth in the declarations of Mr. and Mrs. Justo, at the time of his arrest, Mr. Justo was close to opening the Baan Shanti Resort on Koh Samui Island that he had purchased and renovated into a luxury resort to operate as a business.[92] After Mr. Justo was incarcerated, he could no longer maintain or open the resort. Then, the safety of his wife and child were threatened and, given the limited probability of his release, Mr. Justo was forced to sell the resort on short notice and at a discounted price.[93] After his release and return to Switzerland, Mr. Justo was informed that he would be refused entry to Thailand for the next hundred years, further confirming that it would have been impossible for him to continue operating the resort.[94] While in Thailand, Mr. Justo had also established Justo Consulting (HK) LTD under which he could provide financial consulting services, drawing on

---

[92]   X. Justo Decl. ¶¶ 82-87.

[93]   X. Justo Decl. ¶¶ 87-90; L. Justo Decl. ¶¶ 25-33.

[94]   X. Justo Decl. ¶ 67.



The Honorable Margo K. Brodie
May 15, 2025
Page 19

his track record as a finance industry professional.[95]  While he was in prison, Mr. Justo had to shut down the business and, after his release, Mr. Justo could not return to a career as a finance industry professional.[96]  Mr. Justo describes his efforts to rebuild his personal service business after he was wrongfully imprisoned and explains that since then he has not earned more than 50,000 Swiss Francs a year, despite having earned salaries more than double that prior to the injuries he suffered.[97]  Because Mr. Justo's losses are directly traceable to Mr. Leissner's scheme, Mr. Leissner should compensate Mr. Justo for the lost value of the resort and the personal service business.  *See Lebedev*, 932 F.3d at 57 (requiring defendant to pay its regulator restitution for losses it incurred as a result of the failure of a credit union flowing from defendant's misconduct); *OZ Africa Mgmt. GP, LLC*, 2019 WL 4199904, at *6 (collecting cases and noting that "[c]laimants lost a promising [business] opportunity . . . while th[e] uncertainty makes calculating restitution more difficult, it does not preclude [c]laimants from being victims").

Furthermore, these losses proximately flowed from the actions of Mr. Leissner's co-conspirators.  The same individuals that ensured Mr. Justo was imprisoned also made sure to interfere with his resort and publicly discredit him.  Mr. Mahony feigned interest in helping Mrs. Justo sell the resort, just to string her along further with the ruse that PetroSaudi would rescue Mr. Justo from prison.[98]  As for Mr. Justo's lost personal service business, the focus of imprisoning him and coercing his confessions was to prop up a false narrative, allowing those syphoning money through 1MDB to retain—and gain more—ill-gotten funds.  Mr. Justo was also forced to spread lies through additional journalists about Ms. Rewcastle Brown and discredit what she had published.[99]  PetroSaudi even hired a Swiss lawyer to represent both Mr. Justo and PetroSaudi—his accuser—and had the lawyer speak to the Swiss press to further publicize the false 1MDB narrative.[100]  Mr. Justo's contrived criminal conviction had lasting, direct impacts on Mr. Justo's personal service business.

The loss of Mr. Justo's businesses has been reasonably approximated by expert Gene B. Phillips in his report attached hereto.  In his report, Mr. Phillips values Mr. Justo's loss in the Baan Shanti Resort and the lost business opportunities he has suffered.  As to the first calculation of the value of the loss of the Baan Shanti Resort, Mr. Phillips begins with a valuation of the Baan Shanti Resort by a chartered surveyor from January 29, 2014.  *Id.*  He then scales this value to an equivalent June 2015 valuation in accordance with the growth of the Bank of Thailand's Residential Property Price Index and Land Price Index.  *Id.*  This process added roughly 8.6% to

---

[95]  X. Justo Decl. ¶¶ 95-99.

[96]  X. Justo Decl. ¶¶ 95-106; L. Justo Decl. ¶¶ 26-27.

[97]  X. Justo Decl. ¶¶ 6-8, 102-09.

[98]  L. Justo Decl. ¶ 27.

[99]  X. Justo Decl. ¶ 58.

[100]  X. Justo Decl. ¶ 62.



The Honorable Margo K. Brodie
May 15, 2025
Page 20

the January 2014 valuation to convert it to a June 2015 equivalent. *Id.* Consistent with the MVRA, Mr. Phillips then reduces the loss amount by the cash recovered by Mr. Justo from the forced sale of the Baan Shanti Resort. *Id.* In total, according to this conservative methodology, Mr. Phillips estimates Mr. Justo lost $2,184,250 in the forced sale of the resort as of the time of the crime. *Id.*

As to the second calculation of the value of the loss of the professional business opportunities, Mr. Phillips considers Mr. Justo's track record as a finance industry professional to value what he lost as a result of the criminal conduct that culminated in his imprisonment and precluded him from returning to the market as a finance industry professional. *Id.* Mr. Phillips conservatively assumes that Mr. Justo would have been able to earn at least 500,000 Swiss Francs per annum as a starting point from 2015 for his total annual compensation package as an experienced finance industry professional. *Id.* To determine the loss to Mr. Justo when he was unable to earn that amount, Mr. Phillips calculates the delta between that salary and Mr. Justo's real-world earning potential after his arrest and conviction as a median professional in Switzerland. *Id.* In Mr. Phillips' analysis, Mr. Justo's finance industry professional earning potential increases by approximately 0.9% per annum, while his real-world earnings potential increases by 1.4%, for each year after 2015 based on historical figures showing a commensurate growth in prior years. *Id.* In total, with this conservative methodology, Mr. Phillips estimates Mr. Justo lost $7,341,476 as of the time of the crime. *Id.* The Court should include these amounts in its restitution award.

### C.    Mr. Justo is Entitled to Restitution for 1MDB Investigation Expenses

While Mr. Justo was incarcerated, his wife traveled to London to share information with the FBI on Mr. Justo's behalf.[101]  The airfare for the visit was $1,054.02 and is reimbursable as an expense "incurred during participation in the investigation or prosecution of the offense" under 18 U.S.C. § 3663A(b)(4).

### D.    Mr. Justo is Entitled to Prejudgment Interest to Make Him Whole

A 9% per annum pre-judgment interest on the base restitution amount will fully compensate Mr. Justo for the loss of the ability to put his money to productive use.

It is well-settled that, under the MVRA, prejudgment interest may be awarded as a component of restitution to "ensure compensation 'in the full amount of each victim's losses.'" *Qurashi*, 634 F.3d at 704 (quoting 18 U.S.C. § 3664(f)(1)(A)).  The purpose of prejudgment interest is to make victims whole by compensating them for "the loss of the ability to put their money to productive use." *Id.* at 705; *United States v. Jaffe*, 314 F. Supp. 2d 216, 224 (S.D.N.Y.

---

[101]  L. Justo Decl. ¶¶ 35-39.



The Honorable Margo K. Brodie
May 15, 2025
Page 21

2004) (explaining that restitution should reflect the loss of a victim's "use and benefit of" funds), *aff'd*, 417 F. 3d 259 (2005).

In the Second Circuit, "'[t]he rate of pre-judgment interest is within the broad discretion of the district court." *New York Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 131 (2d Cir. 2001). Where a federal statute, such as the MVRA, is silent on the applicable prejudgment interest rate, the "'common practice' among courts within the Second Circuit is to grant interest at a rate of 9%, the rate of prejudgment interest under New York State law.'" *Garden City Boxing Club, Inc. v. Morales,* 2005 WL 2476264, at *10 (E.D.N.Y. Oct. 7, 2005) (citation omitted). In *Jaffe*, the court applied the New York statutory rate to an MVRA award for victims of bank fraud, explaining that "[a] nine percent interest rate is standard" in districts of this Circuit "for all kinds of commercial cases, including cases requiring restitution." 314 F. Supp. 2d at 224.

Courts frequently apply New York's 9% prejudgment interest rate in cases involving federal statutes that do not specify an applicable rate. *See, e.g.*, *SEIU, Loc. 32BJ v. Dayton Beach Park No. 1 Corp.*, 2019 WL 120998, at *4 (S.D.N.Y. Jan. 4, 2019) ("Since the [Labor Management Relations Act] is silent with respect to interest rate, 'the common practice among courts within the Second Circuit is to grant interest at a rate of nine percent per annum . . . .'"); *Olaf Sööt Design, LLC v. Daktronics, Inc.*, 406 F. Supp. 3d 328, 355-56 (S.D.N.Y. 2019) (same, in federal patent cases), *rev'd in part on other grounds*, 839 F. App'x 505 (Fed. Cir. 2021); *Perez v. Progenics Pharms., Inc.*, 204 F. Supp. 3d 528, 546-47 (S.D.N.Y. 2016) (applying New York's statutory rate to claim under Sarbanes-Oxley Act).

As the court in *Jaffe* explained, the 9% prejudgment interest rate is appropriate in the MVRA context because restitution "is intended to return to the victim that which was wrongfully wrested from him and, since he was deprived of the use and benefit of his funds, restitution should reflect that loss as well." 314 F. Supp. 2d at 224; *see also Alfano v. Cigna Life Ins. Co. of NY*, 2009 WL 890626, at *7 (S.D.N.Y. Apr. 2, 2009) (finding that prejudgment interest should be calculated applying New York's statutory 9% rate, which more accurately captured the "true loss to [the] plaintiff"). The reasoning in *Jaffe* supports a similar outcome here: applying the 9% interest rate to the base restitution amount yields a result that closely approximates the financial harm Mr. Justo suffered when he became an intended victim of Mr. Leissner's admitted participation in the 1MDB scheme.

Hence, a simple interest rate of at least 9%, calculated through the date of sentencing, is necessary to fully compensate Mr. Justo for the loss of the ability to put his money that he would have had as cash to productive use. For these reasons, the Court should award pre-judgment interest on the following amounts:

- $87,801.29 in pre-judgment interest on the unlawful incarceration costs, together with the $128,500 unlawful incarceration costs, totals $216,301.29;



The Honorable Margo K. Brodie
May 15, 2025
Page 22

- $6,569,313 in pre-judgment interest for the ten-year period from the loss of the professional business opportunities, together with the $7,341,476 lost business, totals $13,910,789; and

- $1,954,515 in pre-judgment interest for the ten-year period from the loss of the resort, together with the $2,184,250 loss of the resort, totals $4,138,765.

**CONCLUSION**

For the above reasons, Mr. Justo is entitled to restitution of $18,266,909.31 for losses that were the direct and proximate result of the conspiracies to which Mr. Leissner pled guilty.

Respectfully submitted,

**COHEN & GRESSER LLP**

*/s/ Mark S. Cohen*
Mark S. Cohen
Oliver Haker
Shannon A. Daugherty
Christine M. Jordan
800 Third Avenue, 21st Floor
New York, NY  10022
Tel:  +1 212 957 7600
mcohen@cohengresser.com
ohaker@cohengresser.com
sdaugherty@cohengresser.com
cjordan@cohengresser.com

*Attorneys for Xavier Justo*