

U.S. Department of Justice

United States Attorney
Eastern District of New York

AES/DGR/DAS  
F. #2016R00467

271 Cadman Plaza East  
Brooklyn, New York 11201

May 23, 2025

By ECF

The Honorable Margo K. Brodie  
Chief United States District Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

      Re:    United States v. Tim Leissner  
                Criminal Docket No. 18-439 (MKB)

Dear Chief Judge Brodie:

      The government respectfully submits this letter in response to Xavier Justo's application for $18,266,909.31 in restitution. See ECF No. 91 (the "Justo Letter" or "Justo Ltr."). As set forth in more detail below, the government cannot establish that Mr. Justo is a victim entitled to restitution under the Mandatory Victims Restitution Act ("MVRA") because his losses do not arise from the specific conduct that is the basis of Leissner's offenses of conviction. As a result, Mr. Justo should not be awarded restitution in this case.

      A.      Background

           1.      Leissner's Plea

      On August 28, 2018, Leissner pled guilty to a two-count information charging him with conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), in violation of 18 U.S.C. § 371, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). See Aug. 28, 2018 Dkt. Entry. Both counts charged conspiracies occurring in or about and between January 2009 and October 2014. See ECF No. 16 (the "Information") at ¶¶ 47, 50.

      The charges in the Information detailed Leissner's role in a scheme to bribe foreign officials in Malaysia and Abu Dhabi to win business—specifically, three bond deals valued at approximately $6.5 billion—from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly owned and controlled by the government of Malaysia, for Leissner's employer, The Goldman Sachs Group, Inc. ("Goldman" or "Goldman Sachs"). See id. ¶¶ 17-19. In order to obtain the necessary approvals to proceed with the 1MDB

bond deals,[1] Leissner also willfully circumvented Goldman's internal controls. See id. ¶¶ 20-23. And Leissner was also charged with conspiring to launder the illicit proceeds of the scheme, which included not only the bribes paid to foreign officials to secure the 1MDB business, but also kickbacks to himself and other co-conspirators. See id. ¶¶ 24, 35, 40, 45.

At his plea hearing, Leissner specifically "allocut[ed] to conduct from 2009 to 2014," and admitted that "with the intent to benefit Goldman Sachs and myself . . . [he] entered into a conspiracy . . . to pay bribes and kickbacks to obtain and then retain business from 1MDB for Goldman Sachs." ECF No. 47-1 ("Plea Tr.") at 37:3-22. "The goal of paying bribes and kickbacks," Leissner continued, "was to influence the government officials to take official action so that Goldman Sachs would receive business from 1MDB." Id. at 38:11-13. Leissner also stated that he "knew that the use of shell companies in these . . . fund transfers was designed, at least in part, to conceal and disguise the nature, location, source, ownership, and control of the diverted and the stolen funds." Id. at 38:23-39:2. At no point in his allocution—which this Court found "cover[ed] all of the elements" and was "supported by an independent basis," id. at 40:19-20, 42:16—did Leissner reference Mr. Justo, PetroSaudi (Mr. Justo's former employer, as discussed below), or post-2014 conduct.

2.  Leissner's Testimony

Approximately 3.5 years after pleading guilty, Leissner testified at the trial of one of his co-conspirators, Ng Chong Hwa, also known as "Roger Ng," another Goldman Sachs employee. See United States v. Ng, No. 18-CR-538 (E.D.N.Y.) ("Ng"). Ng was charged alongside Jho Taek Low, also known as "Jho Low," who remains a fugitive, for their roles in the same bribery and money laundering schemes related to the 1MDB bond deals. Id.

Leissner's testimony lasted approximately ten days, and the majority of that testimony focused on the 1MDB bond deals. Among many other topics, Leissner testified about Low's role in the criminal schemes related to the 1MDB bond deals, including that Low orchestrated the criminal scheme to use funds from the 1MDB bond deals to pay bribes and kickbacks to foreign officials and various co-conspirators. See, e.g., Trial Tr. at 412-20. Leissner also testified about the role that Najib Razak, Malaysia's then-Prime Minister, played in the criminal schemes related to the 1MDB bond deals, including that Razak received bribes in exchange for approving the 1MDB bond deals. See, e.g., id. at 460-61.

Leissner provided limited testimony about PetroSaudi, a Saudi Arabian oil company that entered into a joint venture with 1MDB. Specifically, Leissner testified that he and Goldman did not have "any involvement in the joint venture between PetroSaudi and 1MDB." Trial Tr. at 637-38. Leissner testified that he was aware of the joint venture only because Ng had "reported . . . back to [him] that 1MDB had set up a $1 billion joint venture with PetroSaudi" and the two of them "wanted to potentially do a foreign exchange business for the billion dollar investment by 1MDB and PetroSaudi," but that such plans never came to fruition. Id. at 638-39. Leissner was clear that he did not "know personally anything about PetroSaudi or the 1MDB joint venture" or whether "it was true at all that there were any bribes paid in

---

[1] These deals were called Project Magnolia, Project Maximus and Project Catalyze.

2

connection with the PetroSaudi 1MDB joint venture." Id. at 648.  That was largely the extent of Leissner's testimony at trial regarding PetroSaudi.

Leissner also provided limited testimony about an article published in February 2015 in the Sarawak Report, a website run by a former BBC journalist that Leissner testified "was highly critical of the political establishment in Malaysia."[2]  Trial Tr. at 1126.  Specifically, Leissner noted that this article was "focus[ed] . . . on the fact that Goldman Sachs had received outsized fees on the Project Magnolia bond transaction—'outsized' meaning too large, our fees were way too large.  That's . . . what the article was criticizing."  Id.  Leissner also testified that Jasmine Loo, a 1MDB employee, said that the article was "a disappointing blow" and was "asking for rebuttal points . . . to counter the claims that Sarawak Report is making in the article."  Id. at 1127.  Leissner did not testify about specific, or even general, retaliatory actions that he and his co-conspirators planned to take in response to this article or any news reports.

Over the course of his testimony, Leissner did not mention Mr. Justo.

### 3. Mr. Justo's Background

According to his submission, Mr. Justo was recruited to work at PetroSaudi in early 2010.  Justo Ltr. at 5.  Mr. Justo worked at PetroSaudi for approximately one year, resigning in April 2011.  Id. at 5-6.  By the time of his departure, Mr. Justo claims he had "growing apprehensions concerning PetroSaudi's business operations" and sought to protect himself by obtaining a copy of the PetroSaudi server before leaving the company.  Id. at 6.

In spring 2014, approximately three years after Mr. Justo left PetroSaudi, a journalist contacted Mr. Justo "to speak about PetroSaudi, 1MDB, and Malaysian government corruption."  Justo Ltr. at 7.  "After several conversations," Mr. Justo claims, he "shared documents from the PetroSaudi server" with the journalist, who "relied on those documents" to publish the February 2015 Sarawak Report article.  Id.

On June 22, 2015, Mr. Justo was arrested in Thailand on charges of extortion and blackmail that he claims were initiated by PetroSaudi in retaliation for his speaking with the Sarawak Report to expose 1MDB.  See Justo Ltr. at 7.  Mr. Justo claims that, while incarcerated on these charges, he was forced into false confessions designed to undermine the reporting in the Sarawak Report and ensure that Low and Razak "would not be further exposed" for their roles in corruption at PetroSaudi, 1MDB, and/or the Malaysian government.  Id. at 7-8.  Mr. Justo

---

[2]  The Sarawak Report article was published amid a chorus of other news articles scrutinizing 1MDB, including reports in the New York Times, the Sunday Times and the Economist.  See, e.g., "Towers of Conspiracy, Jho Low, Well Connected in Malaysia, Has an Appetite for New York," New York Times, https://www.nytimes.com/2015/02/09/nyregion/jho-low-young-malaysian-has-an-appetite-for-new-york.html; "Harrow playboy linked to troubled Malaysian fund," Sunday Times, https://www.thetimes.co.uk/article/harrow-playboy-linked-to-troubled-malaysian-fund-f8j92snf0vc; "Gathering steam," Economist, https://www.economist.com/asia/2015/03/05/gathering-steam.

specifically claims that he was told that Razak "was controlling Mr. Justo's fate" and had "personally interfere[d]" with efforts to relocate Mr. Justo from Thailand to Switzerland. Id.

Mr. Justo was ultimately convicted of blackmail and served approximately 18 months in Thai prison before being released in December 2016. See id. at 8-9. Mr. Justo claims that "[h]e incurred significant costs as a result of his unlawful incarceration," including being "forced to sell . . . a luxury resort that he planned to operate in Thailand," as well as lost business and litigation-related expenses. Id. at 9. Specifically, Mr. Justo seeks restitution of $18,266,909.31, comprising $128,500 in "costs directly flowing from [his] unlawful incarceration"; $9,525,726 in "lost property" relating to the Thailand resort; $1,054.02 in "expenses incurred during participation in the 1MDB investigation"; and $8,611,629.29 in prejudgment interest. Id. at 2; see also id. at 15-22 (explaining these claims in greater detail).

B. Relevant Law

As a foundational matter, "restitution may be imposed only for losses arising from the specific conduct that is the basis of the offense of conviction." United States v. Goodrich, 12 F.4th 219, 228 (2d Cir. 2021); see United States v. Vilar, 729 F.3d 62, 97 (2d Cir. 2013). "Where, as here, the offense of conviction is a conspiracy, [courts] look to 'the defendant's criminal conduct in the course of' that conspiracy as the basis for restitution." Goodrich, 12 F.4th at 228 (quoting 18 U.S.C. § 3663A(a)(2)). "[T]his statutory language does not limit restitution to losses caused by the actions of that defendant during the conspiracy, but also embraces losses flowing from the reasonably foreseeable actions of that defendant's co-conspirators." Id.; see United States v. Boyd, 222 F.3d 47, 50-51 (2d Cir. 2000).

The MVRA defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). "To qualify as a 'victim,' then, a party must have endured a financial loss that was 'directly and proximately' caused by a defendant's [crime]." United States v. Calderon, 944 F.3d 72, 95 (2d Cir. 2019); see also United States v. Watson, No. 23-CR-82 (EK), 2024 WL 4827734, at *12 (E.D.N.Y. Nov. 19, 2024) ("To claim restitution in a criminal case, an alleged fraud victim must have endured a financial loss that was directly or proximately caused by a defendant's fraud."). "The basic question that a proximate cause requirement presents is whether the harm alleged has a sufficiently close connection to the conduct at issue." Robers v. United States, 572 U.S. 639, 645 (2014); see Calderon, 944 F.3d at 95 ("The MVRA's proximate causation requirement is . . . akin to the well-established requirement that there be loss causation in securities-fraud cases and not merely transaction ('but-for') causation.").

"The Government bears the burden of proving a victim's actual loss by a preponderance of the evidence." United States v. Finazzo, 850 F.3d 94, 117 (2d Cir. 2017); accord Goodrich, 12 F.4th at 231.

C. Analysis

Based on Leissner's crimes of conviction, the evidence adduced at the Ng trial, and the facts as set forth in the Justo Letter, the government cannot establish that Mr. Justo is a victim entitled to restitution under the MVRA. The losses endured by Mr. Justo stemming from

4

his conviction and incarceration in Thailand[3] were not reasonably foreseeable to Leissner and are too attenuated from his crimes of conviction to warrant relief.

Leissner was charged with conspiracy to violate the FCPA based on his participation in a scheme to pay bribes and kickbacks to himself and various foreign governmental officials—using funds that were meant for the Malaysian people—in order to secure the 1MDB bond deals for Goldman Sachs, and conspiracy to commit money laundering for transferring funds internationally to both promote and conceal that scheme. See Information ¶¶ 46-50. Leissner allocated to this conduct at his plea hearing (Plea Tr. at 36-40) and testified at length about it at the Ng trial.

Nothing about Leissner's crimes of conviction indicates that losses to Mr. Justo were reasonably foreseeable to Leissner. Indeed, Mr. Justo and PetroSaudi were not mentioned in the charging instrument or at Leissner's plea hearing, which focused on the charged crimes related to the 1MDB bond deals. And as noted above, Leissner's trial testimony about PetroSaudi was brief and was focused on the fact that he lacked personal knowledge about the business relationship between PetroSaudi and 1MDB.[4] See Trial Tr. at 637-48. Moreover, the sequence of events that Mr. Justo alleges led to his imprisonment, none of which involve Leissner, Goldman or the 1MDB bond deals—including Mr. Justo's hiring and departure from PetroSaudi; his procurement of the PetroSaudi server; his move to Thailand; and his being contacted by, and decision to speak with, a Sarawak Report journalist—is too far afield from Leissner's conduct to have been reasonably foreseeable to Leissner. Against this backdrop, the government respectfully submits that Leissner could not have reasonably foreseen what allegedly happened to Mr. Justo in connection with a business relationship that Leissner was not involved in and had no personal knowledge of, which forecloses relief for Mr. Justo under the MVRA. That these events may have involved certain of Leissner's co-conspirators in the separate criminal scheme related to the 1MDB bond deals does not change this analysis.

There is also insufficient evidence to support Mr. Justo's argument that the events that befell him in Thailand—which he claims were retaliation for his communications with

---

[3] The government takes no position herein regarding the lawfulness of Mr. Justo's conviction and incarceration in Thailand, or the terms and timing of his release from custody.

[4] Mr. Justo claims in his submission that Leissner "attempted to leverage his investment banking connections to obtain a $1 billion valuation of PetroSaudi-owned drillships and related contracts . . . that were worth only a fraction of that cost." Justo Ltr. at 4; see also id. at 12 (describing Leissner's purported dealings regarding PetroSaudi). However, these claims do not appear to be based on Mr. Justo's personal knowledge. See id. (citing ECF No. 91-1 ¶ 21 (Mr. Justo's declaration explaining that he "later learned" the information he is alleging regarding Leissner's relationship and dealings with PetroSaudi)). In addition, the portions of the civil complaint that Mr. Justo cites in support of these claims do not mention Leissner at all. See United States v. All Funds Constituting Arbitration Award in *PetroSaudi v. PDVSA* Uncitral Arbitration, No. 20-CV-8466 (C.D. Cal.), Dkt. No. 90 ¶¶ 133-48. Accordingly, Mr. Justo's assertions about Leissner's role vis-à-vis PetroSaudi should not be accorded much, if any, weight here.

journalists to unmask the 1MDB scheme of which Leissner was a part—were "directly and proximately" caused by Leissner's offenses, as the MVRA and Second Circuit require. 18 U.S.C. § 3663A(a)(2); e.g., Calderon, 944 F.3d at 95. In the light most favorable to Mr. Justo, his argument amounts to a claim that he suffered various losses because he was unlawfully imprisoned as a result of actions by Low and Razak to stifle questions about the legitimacy of 1MDB and to exact retribution on someone who threatened the scheme. See Justo Ltr. at 7-9. To hold Leissner responsible for Mr. Justo's losses resulting from these alleged actions of Leissner's co-conspirators because Leissner had a "central role" in the separate conspiracy involving the 1MDB bond deals (id. at 11) stretches the MVRA beyond its text and purpose.

As an initial matter, Mr. Justo has failed to show that Leissner's actions directly caused his losses. Leissner was charged with and convicted of bribery and money laundering schemes under United States law for conduct that predated Mr. Justo's incarceration in Thailand. Again, nothing in the information, plea allocution or trial testimony touched on Mr. Justo or his allegedly wrongful imprisonment. See Goodrich, 12 F.4th at 231, 234 (reversing the imposition of a restitution obligation for "losses to the private placement victims" after noting that it was "[t]elling[]," although not dispositive, that "nowhere in [the defendant's] plea hearing, the Plea Agreement, or the Superseding Indictment is there any reference to the private placement"). The government submits that the lack of direct causation, as evidenced by the key documents and transcripts, is a sufficient basis to deny Mr. Justo's restitution claim at the threshold.

But even if there were some "but-for" causal link between Leissner's crimes of conviction and Mr. Justo's losses, the law also requires "proximate" causation. See, e.g., Calderon, 944 F.3d at 95. As the Circuit has explained, the "central goal of a proximate cause requirement is to limit the defendant's liability to the kinds of harms he risked by his conduct, the idea being that if a resulting harm was too far outside the risks his conduct created, it would be unjust or impractical to impose liability." Id.; see also United States v. Reifler, 446 F.3d 65, 135 (2d Cir. 2006) (noting that "proximate cause" in the context of the MVRA is a "tool[] . . . used to limit a person's responsibility for the consequences of that person's own acts"). Here, the idea that Mr. Justo would be jailed in Thailand for leaking documents to a reporter regarding corruption at 1MDB, and that Mr. Justo would lose out on the opportunity to successfully open a resort as a result of his incarceration, is simply "too far outside the risks" that Leissner's criminal conduct created.[5] The MVRA therefore does not entitle Mr. Justo to restitution.

Finally, throughout his submission, Mr. Justo repeatedly cites Leissner's trial testimony that he "drew some comfort" from the fact that Razak won the Malaysian election and could therefore be in a position to "diminish or squash any kind of investigation that could happen otherwise around 1MDB and the bonds." See Justo Ltr. at 5, 11, 14, 17 (citing Trial Tr.

---

[5] Mr. Justo distills his claim as follows: "Absent the FCPA and money laundering conspiracies that Mr. Leissner agreed to and actively participated in, Mr. Justo would not have been prosecuted and imprisoned." Justo Ltr. at 12. Even taking Mr. Justo at his word, that is but-for, not proximate, causation, and he is not a victim under the MVRA. See Calderon, 944 F.3d at 96-97 (cautioning against "confus[ing] 'but-for' causation with proximate causation" and reversing a restitution order imposed under the MVRA).

6

at 1124). Despite its repeated invocation, this testimony does not amount to an admission, or even a suggestion, that Leissner could reasonably foresee Razak colluding with the Thai government to imprison Mr. Justo for leaking information about 1MDB to the press, or that these actions were directly or proximately caused by Leissner's crimes. Rather, this statement is an obvious recognition that having a co-conspirator in a powerful position like Razak could potentially quell any investigations or reporting about 1MDB in the first instance, thus increasing the scheme's chances of success. The notion that this single line of testimony demonstrates an understanding or likelihood that certain of Leissner's co-conspirators in the 1MDB bond scheme would retaliate against people like Mr. Justo is too strained and speculative to warrant relief.

\*    \*    \*

Setting aside whether Mr. Justo's incarceration was unlawful and whether certain of Leissner's co-conspirators were responsible for it, as well as whether the monetary figures Mr. Justo quotes are accurate, awarding Mr. Justo restitution from Leissner on these facts would expand the MVRA beyond what was intended and run afoul of Second Circuit caselaw. The Court should deny his claim for restitution.

D.   Conclusion

For the reasons stated above, the government cannot establish by a preponderance of the evidence that Mr. Justo is a victim of Leissner's crimes of conviction under the MVRA. Accordingly, the government respectfully submits that this Court should reject Mr. Justo's restitution claim.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:   /s/
Alixandra E. Smith
Drew G. Rolle
Dylan A. Stern
Assistant U.S. Attorneys
(718) 254-6213

cc:   Clerk of the Court (MKB) (by ECF and email)
Defense counsel (by ECF and email)
Counsel for Xavier Justo (by email)